Rose **MOSES**

v.

**C. Rodgers BURGIN et al.**

**Civ. A. No. 67–880.**

United States District Court,
D. Massachusetts.

Aug. 18, 1970.

As Amended Aug. 27, 1970.

34

Abraham L. Pomerantz and Richard M. Meyer, Pomerantz, Levy, Haudek & Block, New York City, Avram G. Hammer, Boston, Mass., for plaintiff.

Edward B. Hanify, Edward P. Lawrence, George C. Caner, Jr., Ropes & Gray, Joseph P. Rooney, Richard M. Reilly, Boston, Mass., for Edward C. Johnson, II, George Sullivan, Frank D. Mills, George S. McEwan, Edward C. Johnson, III, Caleb Loring, Jr., Edward D. Windsor, William L. Byrnes, Chester Hamilton, Fidelity Management & Research Co. and The Crosby Corp.

Sumner H. Babcock, Bingham, Dana & Gould, Boston, Mass., for C. Rodgers Burgin, George R. Harding, Gilbert H. Hood, Jr., and Ronald Jones.

Richard C. Evarts, Lyne, Woodworth & Evarts, Boston, Mass., for Fidelity Fund, Inc.

## FINDINGS OF FACT AND OPINION INCORPORATING CONCLUSIONS OF LAW

WYZANSKI, Chief Judge.

### I.

### Introduction.

This is a stockholder's derivative action brought against a mutual fund registered under the Investment Company Act of 1940, 15 U.S.C. secs. 80a–1 et seq., (hereafter called "the Act"), its directors, its investment adviser, and its underwriter. Plaintiff alleges that she through her company has been injured by defendants' violations of their

statutory duties under secs. 1, 15, 36 and 37 of the Act, 15 U.S.C. secs. 80a–1, 15, 35 and 36, and of their non-statutory fiduciary duties.

Plaintiff's main challenge is to the practices followed by the mutual fund in (a) placing much of its portfolio brokerage (that is, orders for the purchase and sale of securities) with stockbrokers who as dealers had sold to the public new shares of the fund or who had provided statistical information for the fund or its manager and (b) directing such parts of a stockbroker's commission as he is willing to surrender, (that is, give up,) to other stockbrokers who had sold such shares or who had provided such statistical information.

In the language of the securities industry, the placing of portfolio brokerage with a stockbroker who has sold fund shares, or has supplied information, or otherwise served the customer is called "reciprocity"; the part of that stockbroker's commission which he retains is called a "reciprocal"; and the part which he surrenders to another stockbroker designated by the customer is called a "customer-directed give-up", or more simply and more usually a "give-up".

Stated broadly, the principal questions presented by this action are: (1) did defendants in placing the fund's brokerage on a reciprocal basis violate a statutory or non-statutory duty to secure for the fund the best execution of its purchase and sale orders; (2) did defendants in using the give-ups to stimulate sales of fund shares and supply of statistical information violate a statutory or non-statutory duty to secure for the fund a greater benefit by using the give-ups in some other way, such as by directing them to the fund's underwriter, or to a stockbroker affiliated with the fund or its management; (3) did defendants in taking into account sales of shares of, and information furnished to, sister funds (into whose shares the shares of this fund were convertible) when defendants placed this fund's brokerage on a reciprocal basis and directed give-ups violate a statutory or non-statutory duty not to mingle the assets of different trusts; and (4) did defendants in omitting from the text of the investment advisory and underwriting contracts of the fund sufficient reference to reciprocal and give-up practices they followed render those contracts invalid under section 15 of the Act.

## II.

### Findings of Fact.

#### A. Parties

1. Plaintiff Rose Moses is and since 1960 has been a stockholder of Fidelity Fund, Inc.

2. Defendant Fidelity Fund Inc. ("FF"), a Massachusetts corporation, is an investment company or open-end mutual fund, registered under the Act, and seeking long term capital growth and income. As of mid-1968 it had net assets of over $834 million. In December 1967 it had 76,600 shareholders. FF is part of a group of 12 sister funds (hereafter collectively called "the Fidelity group"). They have different sizes and different investment objects, but they all have the same officers, directors, adviser and underwriter. As of mid-1968 the group had net assets of about $4 billion.

3. Defendant Fidelity Management & Research Company ("FMR"), a Delaware corporation, is the investment adviser of FF pursuant to annual contracts in purported compliance with Section 15 (a) of the Act. Under the contracts, FF pays FMR an annual advisory fee equal to 0.5% of FF's net assets up to $200 million and 0.35% of all net assets in excess of that amount. FMR received in advisory fees from FF more than $2.7 million in 1967 and $3.1 million in 1968 and from the whole Fidelity group in 1967 about $14 million.

4. Defendant The Crosby Corporation ("Crosby"), a Delaware corporation, is a wholly owned subsidiary of FMR, and is an underwriter which has as its exclusive business selling at wholesale shares of the Fidelity group to in-

dependent securities dealers across the country who in turn sell them to prospective investors. FF, pursuant to annual contracts in purported compliance with Section 15(b) of the Act, sells its shares at their current asset value to Crosby, and Crosby and its dealers are authorized to make sale charges as set forth in a prospectus. The incoming shareholders pay these sale charges which start at 7½% of the offering price and scale down after $25,000, according to the amount of the sale. Of the sales charge Crosby retains a maximum of 1½%, and the dealer a maximum of 6%. Crosby received net underwriting commissions from new investors in FF in 1967 over $533 thousand, and in 1968 over $803 thousand.

5. Defendant Edward C. Johnson 2d is the president and a director of FF. He is also the president, a director, and the principal stockholder of FMR.

6. Defendant Edward C. Johnson 3d is a director of FF and of FMR.

7. Defendants Burgin, Harding, Hood, Jones, McKenzie, and Schermerhorn are or recently have been directors of FF, and each claims he is not "an affiliated person" within the meaning of Section 10(a) of the Act. These defendants call themselves "unaffiliated directors".

### B. FF's Methods of Handling Brokerage

8. At all material times, FF, pursuant to its advisory contract, relied for investment advice as to which securities it should buy, sell, and hold upon the investment committee of FMR and of FF which reached its conclusions with the aid of FMR's research department.

9. FMR transmitted lists of securities to be bought, or sold, or held to a so-called portfolio manager, Joseph Midwood, a vice president of FF, but paid by FMR. He, within the framework of those lists, which constituted FMR investment committee authorizations, determined when a particular purchase or sale should be effected: He transmitted his determination to buy or sell a security to FF's trading department, headed by Miller Laufman, FF's manager of securities transactions, but paid by FMR.

10. Under Laufman's direction, the FF trading department decided through whom or with whom FF would execute the transaction specified by Midwood. At all times, the trading department was under instructions to check prices on all exchanges and on the third market in order to get always the best price, and also the best execution.

11. Examples of those instructions are to be found in what are called "reciprocal reports", that is monthly memoranda from D. George Sullivan, executive vicepresident of FF, and William L. Byrnes, vice president of FF. The earliest reciprocal report in evidence, the one for January 1966, states that "The Trading Department and the account managers should be always mindful that the persons we serve are the shareholders * * *", and that "The Trading Department should continue to use and explore this [third] market, always in the interest of best execution." [Ex. 4A, pp. 2, 3]. The same themes appear consistently in later reports. [Ex. 4B, pp. 2, 3; Ex. 4C, p. 3; Ex. 4D, p. 3, etc.]. Thus the report for August 1966 directs that "In accordance with its usual procedure, the Trading Department should continue to check prices on the third market as well as those on the exchanges in order to get always the best price and, also, the best execution." [Ex. 4H, p. 3].

12. Subject to his over-all instruction that "the best price is paramount" [Ex. 4X, p. 3], Laufman used a list of 50 to 60 primary or lead brokers. This was a compilation of stockbrokers whom Laufman had investigated and of whose capacity to execute transactions he was satisfied. Sometimes Laufman, after investigation, added to that list a broker proposed by Sullivan, on the ground the broker had been successful in selling shares of FF or its sister funds.

13. When determining which broker to select for a particular transaction, Laufman had information from Crosby of the amount of Fidelity group shares each of the primary brokers had sold in the previous month. From that information he set up a quota system so that he could give in the current month each of the primary brokers business from which each would derive and retain commissions equal to at least one percent of his sales of Fidelity group shares during the previous month. Such retained commissions constituted "reciprocals" received by the primary brokers.

14. In the period when give-ups were allowed, that is, until December 5, 1968, before Laufman placed an order with a broker, he knew or learned whether the broker would submit to a give-up of part of his commission on that order. If the transaction did involve a give-up, Chester Hamilton, the treasurer of FF, but paid by FMR, wrote to the giving-up broker a letter identifying the transaction and directing to whom the give-up should be paid. When writing such a letter Hamilton had from Crosby a report showing sales of Fidelity group shares by brokers in the previous month, and from FMR a report showing the value of statistical information supplied to FMR by brokers in the previous month. He allocated give-ups with the purpose and effect of making them roughly proportional to the sales made and statistical information supplied in the previous month.

15. Sullivan and Byrnes prepared, on a monthly basis, reciprocal reports to which reference has already been made. Those reports went not only to Laufman, as already noted, but to a list of FF officers and employees including Johnson 2d, Johnson 3d, Midwood, and Hamilton. The reports were prepared upon a group basis for all Fidelity funds, and did not segregate FF from its sister funds. The reciprocal reports showed, among other facts, what percentage of the group's brokerage commissions went to reward brokers who had sold new shares underwritten by Crosby, and to reward brokers who had provided research material. The reports also listed by name the 25 or so brokerage concerns most frequently used by the Fidelity group, and statistics showing in dollar and percentage terms what, if anything, each received on account of its sales of shares of the Fidelity group and on account of its supply of research information. Also the reports contained instructions and comments, such as those previously quoted.

16. Those reciprocal reports reveal the care with which allotments of the brokerage business were watched. The management of FF knew, as it stated in the reciprocal report for January, 1966, that "The SEC is very conscious of the distribution of commission business. Present procedures require a disclosure of each Fund's activities with respect to portfolio transactions. Undoubtedly this area will be one subject to much review by the SEC." [Ex. 4A, p. 2].

C. *Whether FF Sacrificed Best Execution In Order To Reward Broker-Dealers With Reciprocals And Give-Ups*

17. As already stated, the Trading Department was consistently directed to secure best execution. But the important question is whether those instructions were followed.

18. Laufman, who, as head of FF's trading department, was the person best qualified to know, was examined in a pretrial deposition and again at the trial with respect to how FF's brokerage business was actually handled. The general effect of his testimony was that it was the practice of FF always to insist on best execution in accordance with announced policy and specific directives.

19. Neither cross-examination nor independent evidence showed that in specific transactions FF could have achieved better execution.

20. Laufman's testimony as to FF's practice is supported by different types of evidence, which, admittedly, do not, even when taken cumulatively, embrace every individual FF transaction, but

which, nonetheless, corroborate Laufman as to general practice.

21. Most significant is the substantial use by FF and others in the Fidelity group of the third market. The third market is a term used to describe brokers who trade listed equity securities over-the-counter. Third market brokers act as agents, in which case they charge commissions, or as principals, in which case they ordinarily charge a mark-up or mark-down. They are not subject to stock exchange minimum commission rate schedules. The usual price of a share is the last NYSE price plus or minus one-quarter of a point. But it requires high professional skill to discover which, if any, third market broker at any given point of time will make a trade in a particular security on a better basis than is available on an exchange. The Fidelity group's net cost of trading on the third market was approximately 60% of the cost of trading on a stock exchange. This accords with the common experience of others.

22. The Fidelity group has used the third market far more than any other mutual fund. In 1966 the group executed on the third market 6.91% of its transactions; in 1967, 9.6%; and in 1968, 10 to 12%.

23. Plaintiff attempts to belittle those percentages. She notes that after give-ups had been abolished in December 1968, Fidelity did more of its trading on the third market. But the very document from which plaintiff drew that information explained that the reason Fidelity's use of the third market rose in 1969 was that with the termination of customer-directed give-ups more institutions were coming to the third market as a source for the purchase and sale of larger blocks of securities. [Ex. 41, p. 6].

24. Plaintiff also claims that FF used the third market less than did pension funds and other institutional investors. There is no proper foundation for such a claim. What plaintiff cites is not testimony offered in this case and subject to cross-examination, but a statement in the SEC "Special Study of Securities Markets" H.R.Doc. No. 95, 88th Cong. 1st Sess., p. 881. That statement purports to show that in March 1961 pension funds did 18.7% of their business in the third market. We cannot tell whether securities traded by pension funds are comparable in type or quantity with Fidelity's trades, whether March 1961 is a typical month, or indeed whether the trades were at better execution than stock exchange trades of those securities would have been.

25. Another indication that in practice FF sought best execution is that such a substantial amount of its business went to brokers who must have been chosen solely for excellence in performance inasmuch as they did not sell Fidelity shares or supply FMR with statistical information.

26. For example, of FF's 10 top brokers based on total amount of business done in 1967 in terms of the value of shares traded, 8 were non-sellers. And of the 10 largest broker-dealers used by the Fidelity group as a whole in *principal* transactions (which may not be wholly representative because so many of the securities involved would carry only a small commission) in 1966, 8 were non-sellers; in 1967, 8; and in 1968, 7.

27. Of course, the statistics recited do not foreclose the *possibility* that *some* of the business which went to sellers could have been better executed by non-sellers. Therefore, before using Laufman's testimony and the corroborating evidence as the basis for a finding that best execution was *regularly* achieved by FF, it is necessary to examine countervailing considerations.

28. Laufman, like every employee and officer of FF was paid by FMR. It would have been to FMR's advantage always to give enough of FF's brokerage business to fund sellers so that each of them would get substantial rewards. It might be that FF could not always get enough reciprocals and give-ups to assure substantial rewards *solely* from best execution. However, that is merely a speculation. There is not any evidence to show that best execution would have

failed to supply sufficient reciprocals and give-ups or that there ever was any pressure upon Laufman to do more business than he was doing with brokers who would submit to give-ups. On the contrary, he was urged to use the third market more. Furthermore, there is no evidence that Laufman was the sort of man who could be diverted from his duty to FF because FMR paid him out of the fees it received from FF.

29. Plaintiff seems to argue that if the court considers as significant the number of non-sellers used by FF as brokers, it ought to regard as even more significant the number of sellers used by FF. Such an argument would be fallacious. Every time FF used a non-seller it may fairly be inferred that it was acting on the basis of best execution because it would have no other probable motive. The converse is not true. When FF used as its broker a seller it may not fairly be inferred that FF was not seeking best execution. It is possible, and indeed highly probable, that often best execution was available through either a seller or a non-seller, and that the choice of the seller as broker was consistent with FF's statements in its proxy material that "relative sales of the shares of all of the Funds * * * and statistical and other factual information provided * * * are taken into account where there is no competition among dealers on the basis of price." [Ex. 17–A–5, p. 7].

30. What has just been said disposes of another of plaintiff's contentions. She finds some significance in the fact that only after give-ups became available on certain regional markets did FF use brokers on those markets. Such use of a regional broker does not justify any inference that before give-ups became available he alone offered best execution. If the regional broker offered only the same execution as a NYSE broker, it was consistent with FF's declared policy not to use the regional broker when there were no give-ups on the regional exchange, and to use the regional broker at

least some times when give-ups became available.

31. Plaintiff notes that on occasion FF used a broker who did not have a direct wire to FMR or used an inexperienced broker. It is, of course, possible that in a particular transaction such a handicap precluded best execution. But there is no proof that such was the case. An inferior broker in the transactions entrusted to him may have rendered best execution, and indeed may have been given an order at a particular price or other condition which assured best execution. Laufman's testimony is not to be impeached by speculation that good results may not have been achieved.

32. The last sentence applies also to plaintiff's suggestions that best execution may not have been secured by using sellers of shares as managers of secondary distributions. Of course, it may be that on some occasions a non-seller would have been better. But there is no reason to assume so, or to conclude that competitive bidding would have been likely to produce a better execution than private negotiation. Moreover, since about half the secondary distributions were managed by brokers who were not sellers of Fidelity group shares there is sound ground for finding that best execution was always sought with respect to secondaries.

33. After considering the foregoing and other contentions of plaintiff and the evidence as a whole, and even assuming that defendants have the burden of proof, this court is satisfied that as a matter of practice FF did achieve best execution in its brokerage business. It did not allow considerations relating to the sale of Fidelity shares or to the supply of statistical information to impede or affect its primary concern to obtain the most favorable price for fund portfolio transactions.

D. *The Stock Exchange Rules Within Which FF's Methods of Allocating Give-Ups Developed*

34. So far we have been principally concerned with facts relating to the first

question presented, that is, did defendants in placing the fund's brokerage * * * secure for the fund the best execution of its purchase and sales orders. Now we turn to findings of fact bearing on the second question presented, that is, did defendants in using the give-ups to stimulate sales of fund shares and supply of statistical information violate a statutory or non-statutory duty to secure for the fund a greater benefit by using the give-ups in some other way, such as by directing them to the fund's underwriter, or to a stockbroker affiliated with the fund or its management.

35. Initially, we must attend to the framework of stock exchange constitutions and rules in which customer-directed give-ups were tolerated until abolished December 5, 1968.

36. The practice of permitting customer-directed give-ups had existed at least since the 1950's. It developed at a time when no exchange allowed volume discounts, but brokers sought to attract large orders by giving up part of their commissions as the customer should direct.

37. Even when give-ups were tolerated no exchange would permit (and no informed person thought it lawful or ethical for) a broker to give-up or refund part of his commission to the customer directly. The obstacles were the exchange rules which established minimum rate schedules and prohibited rebates.

38. Typical is the following provision in Article XV, section 1 of the NYSE constitution:

"Commissions shall be charged and collected upon the execution of all orders for the purchase or sale for the account of members or allied members or of parties not members or allied members of the Exchange, of securities admitted to dealings upon the Exchange and these commissions shall be at rates not less than the rates in this Article prescribed; and shall be net and free from any rebate, return, discount or allowance made in any shape

or manner, or by any method or arrangement direct or indirect."

39. Similar provisions are in the constitutions of all the regional exchanges: Boston Stock Exchange constitution, art. XVIII, secs. 1–4; Detroit Stock Exchange constitution, art. XVIII, secs. 1–4; Midwest Stock Exchange Rules, art. XXIX, rules 1–21; Pacific Coast Stock Exchange constitution, art. XIV, secs. 1–8; and Philadelphia-Baltimore-Washington Stock Exchange ("PBW") constitution, art. XX, secs. 1–9.

40. The NYSE interpreted its anti-rebate rule as permitting a NYSE broker to submit to his customer's direction to give up part of the commission to another broker who belonged to the same exchange, but to no one else.

41. The regional exchanges differed. Midwest adopted a rule which reached substantially the same result as the interpretation issued by the NYSE. Midwest Rules, art. V, rule 9. Boston and Detroit allowed give-ups to be directed to members of the NASD who were not members of their respective exchanges. Boston Rules, ch. VII, sec. 4, and Detroit Rules, ch. VII, sec. 9(b). Neither Boston nor Detroit ever interpreted its give-up rule to allow a credit back to the customer. The Philadelphia-Baltimore-Washington exchange (PBW) by art. XX, sec. 2(b) of its constitution permitted a give-up to a member of the NASD under certain circumstances. The Pacific Exchange limits give-ups to members and approved non-members. Pacific rule IV, sec. 5(b) (2).

### E. Other Suggested Methods of Handling FF's Brokerage

42. Much of the evidence in this case is addressed to the issue whether if FF had not used its brokerage give-ups to reward brokers who sold Fidelity group shares or provided research information, FF could have made other choices to the greater advantage of FF's stockholders.

43. Plaintiff speaks of those other choices as methods of "recapture" of the give-ups. The term "recapture" was

used (perhaps for the first time) in connection with give-ups at The Conference on Mutual Funds held at the University of Pennsylvania on February 9 and 10, 1967. See 115 U. of Pa.L.Rev. 662, at 832–834. [Ex. 1–K, Att. 1, pp. 832–834]. Inasmuch as no informed person supposes that under the rules of any exchange the customer may recover directly from the broker any part of the commission, there is no lawful possibility of a "recapture" in the ordinary sense of the word. What plaintiff and others who use the word "recapture" have in mind is the use of give-ups so that the recipient will credit, or arrange for a credit to the benefit of the customer.

44. Many of the suggested ways of using give-ups involve, as Philip A. Loomis, Jr., General Counsel of SEC, remarked at the 1967 University of Pennsylvania conference, "intricacies, distortions and artificialities". [Ex. 1–K, Att. 1, p. 836]. But two of the suggestions, even if somewhat devious, require full exploration. One is the placing of portfolio brokerage with, and the direction of give-ups to, a broker affiliated with a mutual fund adviser; the other is the direction of give-ups to the mutual fund's underwriter. Those two suggestions involve such different techniques that it obfuscates the problems presented by each if they are approached under the broad rubric of "recapture".

### F. Possible Placing of FF's Portfolio Brokerage With, and Direction of Give-Ups to, an Affiliated Broker

45. Plaintiff contends that FF could have required FMR to have become a member of NYSE; then FMR could have collected all or part of FF's portfolio brokerage commissions, and could have credited them against the advisory fees payable by FF. Alternatively, plaintiff says, FF might have retained a NYSE member firm as investment adviser, with brokerage commissions applied to reduce or extinguish the advisory fee.

46. Both those proposals, (and variations of them which can be conceived,) are necessarily premised on the supposi-

tion that it would have been the business judgment of the directors of FF and FMR that it would be desirable for this particular mutual fund (with the history and purposes of FF, with the basis on which it had attracted and hoped hereafter to attract investors, and with the difference from competitive funds it had sought to maintain) to be in such close relation to the brokerage business. In finding the facts, no less than in reaching any conclusions of law, the first inquiry, therefore, is what was the business judgment of the directors of FF and FMR. Indeed the central importance of this point has been recognized by the SEC, as shown by its Exchange Act Release No. 8746 (Ex. A–64), from which the following quotation is taken:

"You first ask whether mutual fund management has a fiduciary duty to acquire a stock-exchange seat, directly or through an affiliate, in order to utilize this means to recapture brokerage which in turn will be offset against management charges. We do not believe that management has this duty if in the exercise of its best business judgment management determines that it is not in the best interest of the fund to create such an affiliate."

47. Although plaintiff argues otherwise, there is abundant proof that the directors of FF and FMR had often addressed their attention to the possibilities of a broker-affiliate and rejected, on objective grounds that were wholly reasonable, any restructuring of FF's adviser so as to involve it in the brokerage business.

48. Johnson 2d had for years considered whether FMR should form or acquire a brokerage affiliate. He felt brokerage was so different a business that it would distract FMR from its primary advisory and management functions. He also felt that such an arrangement would tend to reduce the probability of FF getting best execution of its orders.

49. FF's unaffiliated directors were equally hostile to proposals involving the use of an adviser that had a broker-affiliate or was itself a broker. They

thought that the brokerage and investment businesses did not mix. They feared that benefits produced through advisory fee credits might be lost through poorer executions. They were mindful that broker-affiliates might lead, justly or not, to charges of churning, of increasing portfolio turnover simply to increase the amount of savings of advisory fees, of transactions at prices below best execution, and even of failing to use sufficiently a brokerage affiliate lest management lose part of its advisory fee. They knew that the proposals might lead to vexatious litigation difficult to defend. They foresaw that if the mutual fund used only one broker for most of its transactions, it would increase the likelihood of general disclosure as to who was the principal in the transaction, and might produce a market reaction prejudicial to the fund.

50. That such grounds for being opposed to broker affiliations were entirely rational and consistent with prudent business judgment is sufficiently attested by the Report of The Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth, H.R. No. 2337, 89th Cong., 2nd Sess. (December 2, 1966) [Ex. 6] (hereafter PPI). The SEC pointed to the "ever-present potential for abuse inherent in investment company-broker relationships" (p. 190), "For example, such affiliations could possibly lead investment company managers to adopt investment policies that call for high portfolio turnover rates for the purpose of increasing the amount of brokerage commissions obtainable through their relationship with the companies" (p. 189). "Close affiliations between broker-dealers and investment companies also raise questions relating to the fulfillment of the investment company managers' duty to seek the best execution of portfolio transactions. If its affiliated broker-dealer is an exchange member, the manager of an investment company may be less inclined to consider opportunities for best execution in the third market where the affiliated broker could not earn an exchange commission" (p. 189). [See the unreported and not necessarily well-founded complaints in Josephson v. Campbell, S.D.N.Y.1969 and Horenstein v. Waddell & Reed, Inc., 67 Civ. 4175, S.D.N.Y.1970.]

51. Plaintiff is mistaken in supposing that all the objections raised by the directors would necessarily be obviated if the broker-affiliate operated without a profit and if the broker-affiliate instead of executing transactions was merely what is called an introducing broker.

52. A profitless broker would still have to pay its operating and capital costs.

53. Moreover, the proposal of an introducing broker, who merely gave orders to other brokers to execute, is an idea that no mutual fund has ever tested in practice and which may be full of pitfalls. Even on the assumption that any exchange would tolerate such a blatant institutional circumvention of its anti-rebate rules, an introducing-broker-affiliate, like any other broker-affiliate, would involve a mutual fund and its adviser in many of the disadvantageous consequences feared by Johnson 2d, by the unaffiliated directors of FF, and by others who have eschewed combining investment and brokerage operations in one complex. The least that can be foreseen is that such a relationship would so alter the posture of FF and FMR that it would affect those who had selected, or might select, FF shares as an investment for the very reason that, unlike some other well known funds, FF was wholly independent of any broker as manager or managerial affiliate. Furthermore, such a relationship would necessarily divert to some degree the attention of the managers of the fund from advisory problems to brokerage problems.

54. Quite apart from whether as a matter of business judgment of FF's and FMR's directors a broker affiliation would have been a sound course, most of plaintiff's suggestions of broker

affiliation could not have been realized under the constitution and practices of the NYSE or probably any regional exchange.

55. NYSE consistently in public statements and actions has opposed the admission to membership of an institutional investor seeking to circumvent its anti-rebate rules.

56. Neither FMR nor a broker subsidiary it organized would have overcome that consistent NYSE position or the bar created by Article IX, sec. 7(b)(4) of the NYSE constitution which provides that:

"(b) The Board of Governors shall not approve a corporation as a member corporation unless:

* * * * * *

(4) a primary purpose of such corporation is the transaction of business as a broker or dealer in securities. * * *

As used in that constitutional provision the phrase "a primary purpose" has been construed to mean "the primary purpose". [See letter dated October 31, 1969 from the president of the NYSE (Ex. A–65)]. And there can be no reasonable doubt that, regardless of what proportion of the revenues of a concern like FMR came from brokerage, its primary purpose, to which all other purposes are and would be ancillary, is the management of mutual funds to which it renders advisory service in accordance with the Investment Company Act. The test of whether an applicant is primarily a broker or dealer turns on whether it bona fide engages in the brokerage business in a general way, not necessarily offering the public to handle anyone's account but with the predominant purpose of performing a professional function in the market rather than of serving solely as an adjunct to a particular customer's institutional business.

57. Another reason that FMR, as now-structured, could not become a member of NYSE is that at all times one of FMR's three voting stockholders, has been Homer Chapin, a full time officer of Massachusetts Mutual Life Insurance Company, and Article IX, sec. 7(b)(2) of the NYSE constitution prohibits a corporation from becoming a NYSE member unless "every holder of voting stock * * * actively engages in its [the applicant corporation's] business and devotes the major portion of his time to it."

58. Parallel considerations to those which would have barred FMR from becoming a member of NYSE would also have barred Crosby. Crosby's sole business is that of being an underwriter. It is really a selling agent who (unlike a conventional underwriter) does not bear the risk that the securities will be unsalable. [See PPI p. 55, n. 137. (Ex. 6)]. Crosby's primary purpose is not "the transaction of business as a broker or dealer in securities", as that phrase is used in Article IX, sec. 7(b)(4) of the NYSE constitution, because it does not bona fide engage in the brokerage business in a general way with the predominant purpose of performing a professional function in the market. Another reason that Crosby would have been ineligible for membership in the NYSE is that all of Crosby's stock is owned by FMR, which would make Crosby unable to comply with the condition prescribed by Article IX, sec. 7(b)(2) of the NYSE constitution that a corporate applicant for membership shall not be approved unless "every holder of voting stock in such corporation * * * is an officer or employee of such corporation."

59. The considerations which would have prevented Crosby from becoming a member of the NYSE would also have prevented a subsidiary of FF from acquiring membership. Moreover, [despite the statement in PPI p. 173, footnote 82, (Ex. 6)] Section 12(d)(3) of the Act would have prohibited FF from owning a subsidiary engaged in the brokerage business. See Sen.Rep. No. 1775, 76th Cong., 3d Sess. 15–16 (1940).

60. Factors which would block FMR and subsidiaries of FMR from membership in NYSE, of course, would apply

to any other investment adviser with a comparable structure. To be sure, those factors would not prevent an established broker already a member of NYSE from being retained by FF as an adviser. However, it is not true that the brokerage commission business and the give-ups such a broker received on account of FF trades could be used to reduce all aspects of the advisory fee. The only part of the advisory fee that could be credited with brokerage is that miniscule portion of the advisory fee which covered publications such as investment letters, loose-leaf and like investment services, and the conventional statistical information stockbrokers give customers in return for their business. [See what is called "NYSE Rule 440A", a provision which may not in fact be a rule. See DeRenzis v. Levy, 297 F.Supp. 998, 1000–1001 (S.D.N.Y.)]. The anti-rebate rule of the NYSE would not permit a credit against that part of the advisory fee which represented research in depth or which represented managerial advice beyond what brokers customarily give customers.

61. The same considerations which would have prevented FMR or any subsidiary of FMR from becoming a member of the NYSE would have been applied at all times relevant to this action by almost every, if not every, regional exchange.

62. It is true that in 1965 the Pacific Exchange, under its then rules, had permitted a broker affiliate, organized as a subsidiary of Waddell and Reed, the manager of United Fund Inc. to become a member. Membership had been accorded also to subsidiaries of three other adviser-underwriters: Investors Diversified Services, Inc., Channing Financial Corp., and Imperial Services, Inc. But in each of the four cases the subsidiary broker dealt directly with the public and thus was involved in activities that FMR, Crosby and FF have shunned for reasons already stated.

63. FMR and Crosby, since they did not deal with the public, were not admissible to membership in the Pacific Exchange either before or after the changes in its rules made in July and September 1965. There is in the record before this court no basis on which to suppose that Pacific's rule was in violation of the anti-trust laws. On the contrary, the distinction Pacific drew between brokers dealing with the public and brokers not so dealing had a justification which *prima facie* was valid.

■ 64. To conclude this section of the findings, the court finds that as a matter of fact there were sound business and legal reasons for the directors of FF not to have sought to place FF's portfolio brokerage with, and direct FF's give-ups to, an affiliated broker of any kind; and that those reasons did motivate the directors in not making arrangements with FMR or others for such an affiliated broker.

### G. Possible Directing of FF's Give-Ups to Crosby

65. The possibility of a mutual fund directing its give-ups to its underwriter which in turn would give the fund cash or credit seems to have been first suggested by an employee of the SEC, Silver, on June 3, 1965. At a hearing merely to gather information with respect to "Trading on the Detroit Stock Exchange and Off-Board Trading by Exchange Members", Silver interjected the suggestion that "a rebate (sic!) of commissions" to Crosby thence to FF might be achievable on the Detroit Stock Exchange, under the present rule without being a member. [Ex. 1–C, Att. 1, p. 44].

66. When Silver made the suggestion and at all other times there was no reason to suppose that it complied with the anti-rebate rule of the Detroit Stock Exchange.

67. A year later, in September 1966 at a hearing on "Commission Rate Structure" another employee of the SEC, Rotberg, asked questions about the possibility of FF using Crosby as a member of a regional exchange to get give-ups with which Crosby could then

credit the fund. [Ex. 1–C, Att. 1, pp. 41–44]. Again there was no reason to suppose that this tactic would be permissible under the anti-rebate rules of any exchange.

68. In December 1966 the SEC in its *Report on the Public Policy Implications of Investment Company Growth* stated at p. 173:

"It would not be inconsistent with those [regional exchange] rules for dealer-distributed funds to direct give-ups to their adviser-underwriters, all of whom are NASD members, for the purpose of applying these give-ups to reduce the advisory fees payable by the funds."

69. That statement was not buttressed by any legal analysis or precedent. No mutual fund or its underwriter had used such a device up to the time of the report.

70. Moreover, that statement was in direct conflict with the text of, the policy of, and the then practice under the anti-rebate rules of every exchange.

71. In December 1967 the Philadelphia-Baltimore-Washington Stock Exchange for the first time gave an interpretation that permitted a PBW member at the direction of a mutual fund to give up commissions to its NASD underwriter for the purpose of crediting them against expenses of that mutual fund. The interpretation involved a mutual fund, Pro Fund, Inc., and its adviser, Pro Services, Inc. which was under common control with a PBW member, Cannon & Co. Inc. The interpretation was sought at the suggestion of some SEC staff member, but it does not purport to consider the anti-rebate rules of PBW.

72. January 26, 1968 the SEC issued Release No. 8239 proposing a new Rule 10b–10 under the Securities Exchange Act of 1934 [Ex. 9.] The release stated that:

"The rule, essentially, would prohibit investment company managers from directing brokers executing transactions for an investment company to divide their compensation in any way with other brokers unless the benefits of such division accrue to the investment company and its shareholders."

73. Page 4 of the release mentions "procedures which have been developed and which enable institutional investors to recapture a portion of commissions for themselves." Without specific citation, the release considers the cases in which a mutual fund manager had created a broker-affiliate which joined a regional stock exchange. This, of course, is an indirect reference to Waddell & Reed, Inc., Investors Diversified Services, Inc. and the other two cases on the Pacific exchange. No reference is made to any other type of "recapture" nor to any case where give-ups have been directed to an affiliated underwriter who is an NASD member.

74. The release invited all interested persons to submit their views and comments on Rule 10b–10.

75. After reading this release, Sullivan of FF and FF's general counsel determined to learn whether there were in fact any "recapture" procedures which did not involve the creation of a broker-affiliate. Accordingly, they requested Gaston, Snow, Motley and Holt, the firm which has for many years been the legal adviser of FF and FMR, to investigate all possibilities of recapture on the regional exchanges. That law firm assigned one of its lawyers, Richard M. Reilly, to make an investigation with respect to the possibilities of recapture on all the regional exchanges.

76. Reilly visited each regional exchange to learn the answers to the following three basic questions, to which he referred in a memorandum he prepared on March 25, 1968 on the subject of " 'Recapture' potential on Regional Stock Exchanges" [Ex. 13, p. 1]:

"1. Would it be possible for the Fund directly or indirectly to 'recapture' give-up on commission business it had placed on that exchange? 2. Would it be possible for the Fund

or a subsidiary to qualify for a discount in commission charges on exchange transactions? 3. Would it be possible for the Fund or a subsidiary to qualify for exchange membership?"

It is unnecessary to summarize the memorandum as a whole. But it is here relevant to note that PBW and Pacific both indicated that FMR might be able to use Crosby as a member of the NASD in the case of PBW and as an approved non-member of Pacific to receive give-ups which could then be credited against the advisory fee payable by FF to FMR. However the memorandum emphasized that its conclusions were "tentative at best" (p. 28). The memorandum then stated (pp. 28–29):

"It is to be expected that before definitive decisions would be made the Board of Governors of the various exchanges will be consulted to determine policy and it is likely that the exchanges may delay decisions until the present confusion in the area has settled and certain patterns have emerged. Present plans call for the submission of detailed letters to each of the above exchanges asking for rulings as to the permissibility of the various trading techniques that could result in savings to the fund. With the exception of Philadelphia, none of the exchanges have ever taken official positions on the issues that will be raised in the various letters. It is probably safe to say that none of the exchanges, including Philadelphia, has thought through all the problems."

77. Moving slowly, Reilly prepared for FMR follow-up letters to PBW and Pacific to inquire about the possibility of using Crosby to receive give-ups which could serve as a basis for FMR giving FF credit on its obligation to pay advisory fees.

78. With respect to PBW, FMR wrote on May 24, 1968. But FMR did not wait for an answer. When FMR saw that PBW wrote to the SEC in commenting on proposed rule 10b–10, FMR, beginning May 29, 1968, instructed the PWB exchange brokers with whom it dealt to "bank" give-ups, that is to hold the portion of the commissions which they were prepared to surrender so that, if permissible, FMR could direct them to Crosby, and FMR could credit FF against its advisory fee obligations. By November 1968, the banked give-ups on PBW totalled $18,427.58.

79. With respect to Pacific, FMR wrote on May 27, 1968. Pacific on July 27 confirmed that Crosby could be an approved non-member and thus receive give-ups which would serve as the basis of credits from FMR to FF. The next day FF's directors directed its Pacific brokers to bank give-ups. By November, 1968, the banked give-ups on Pacific were about $22,000.

80. On November 27, 1968, Edward B. Hanify, of Ropes and Gray, and Sumner H. Babcock, of Bingham, Dana, and Gould, acting respectively as counsel for FMR and its unaffiliated directors, advised the board of FF that it was a question of business judgment whether to direct the banked give-ups to Crosby. Counsel said that there was a risk that the direction would be unlawful as being in violation of the anti-rebate rules, but there was also a risk that the chance to make the direction would be lost in a month when the rules abolishing give-ups became effective [Ex. 38].

81. As a matter of business judgment the directors of FF directed that the give-ups banked on PBW and Pacific be given to Crosby so that FMR would credit FF.

82. The foregoing account leaves for later consideration the degree to which the events recited were known to the directors of FF. But the account is complete in the sense of mentioning every known instance of the use by any fund of its underwriter to "recapture" give-ups.

83. There is no ground for supposing that there were other instances. On July 23, 1968 FMR gave the SEC a statement respecting give-up recapture [Ex. 1–H, Att. 7]. FMR told of the steps it had taken to investigate the accuracy of the SEC declaration in Release No. 8239 that mutual funds could "recoup substantial amounts of commissions paid for the execution of their portfolio orders". FMR gave SEC copies of its exchanges of letters with regional exchanges. Then FMR concluded (p. 3):

> "We hope, therefore, that the Commission will scrutinize contentions that a general power to recapture give-ups for mutual funds exist. Particularly important is a thorough examination of the rules of the various stock exchanges and of the NASD. If the Commission finds that a power to recapture does exist, we hope that the procedures for such recapture will be spelled out by the Commission with sufficient precision so that they can be followed, where appropriate, by mutual fund managers. Lacking any such specification at the present time, it is the finding and opinion of the Fidelity Group that give-up recapture abilities to the extent that they exist at all are of limited application and questionable propriety."

The SEC never answered this request for specification.

84. Insofar as it is a question of fact, this court finds that any scheme involving FF's use of its underwriter Crosby as a recipient of a give-up on the understanding that Crosby's parent FMR would give FF a credit against charges for investment advisory services is manifestly a rebate within the meaning of the anti-rebate constitutions and rules of the NYSE and other exchanges. The mere fact that executives of the PBW and Pacific exchanges have acted on a contrary basis does not change that conclusion. Neither PBW's nor Pacific's constitution authorizes its officers to emasculate or destroy by interpretation the anti-rebate rule.

And the rule is not so ambiguous as to permit of any interpretation which sustains give-ups to Crosby for the credit of FF, the customer who placed the brokerage orders on which the give-ups were founded.

### H. Other Possible Uses of Give-Ups

85. Plaintiff has proposed other possible ways in which give-ups conceivably could have been used for the benefit of the shareholders of FF. None of them is supported by any precedent or authoritative ruling; some are unlawful or contrary to what is deemed fair and ethical dealing; all involve hazards that prudent directors would avoid.

86. For example, plaintiff refers to the possible use of so-called "Aunt Minnies". An "Aunt Minnie" involves a broker, with memberships on both NYSE and a regional exchange, giving up part of his commission on a regional exchange in consideration of the recipient arranging to place a trade on the NYSE. Thus the recipient pays for the NYSE trade not the regular commission but that amount less the give-up on the regional exchange. This is an unlawful rebate. It has been winked at, but was never approved by the NYSE or the SEC. Moreover the give-up on the regional exchange is unethical because the trader on the regional exchange (the supposititious "Aunt Minnie") does not know about it.

87. Plaintiff's next proposal, unsupported by evidence, is that FMR could use Crosby in the selling group of underwriters. If Crosby were to participate in a selling group and receive an underwriting commission from FF to be credited to FF's benefit it would apparently violate NASD Rules, Art. III. In situations where the underwriting involved a "firm commitment", (where the principal underwriters buy the securities from the seller and sell them to members of the selling group who in turn sell them to

the public), Crosby would be violating sec. 17(a) (1) of the Act which makes it unlawful for a registered investment company's principal underwriter "knowingly to sell any security * * to such registered company."

88. Recapture through tender offers would involve Crosby in passing benefits to FF, and that would constitute an "allowance" prohibited by NASD Rules, Art. III, sec. 24.

89. In short, there were not lawful methods for FF getting the benefit of give-ups by Aunt Minnies, or underwritings, or tender offers.

*I. Extent to Which Counsel and Unaffiliated Directors of FF Considered Possible Uses of Give-Ups*

90. All the directors of FF regularly received at board meetings detailed reports on all aspects of FF's operations, including placement of brokerage, reciprocals, and give-ups. Included were copies of the so-called N–1R annual reports required by the SEC and transmitted to it. Those reports show FF's primary or leading brokers, the leading recipients of commissions, (including give-ups as well as reciprocals), and the leading sellers of shares. The portfolio manager, Midwood, and the manager of securities transactions, Laufman, frequently appeared before the board to report orally and to answer questions. There were discussions of reciprocals and give-ups and of the system of allocating them on a group basis.

91. All the directors believed that, in the interest of its stockholders, FF should consider as the first and indispensable test in the selection of an FF broker for any transaction his capacity in that transaction to give best execution, and that, the first test being met, FF should select as executing brokers and as give-up recipients those who had sold new shares of the Fidelity group and those who had supplied statistical information. Their common business judgment was that this would promote a net cash inflow to FF and the growth of the fund, which they regarded as beneficial to the shareholders of FF.

92. The directors were aware of the possibility of handling FF's portfolio through a broker affiliate. They regarded such an affiliation as undesirable because it might impede best execution, might stimulate excessive turnover, and might lead to conflicts of interest, or stockholder suspicion of such conflicts. Before this action was brought they did not have knowledge of any other methods of so-called recapture, if indeed any such methods had been actually tried by anyone. They were aware that the preponderant majority of other open-ended mutual funds which did not have captive sales forces followed the same brokerage, reciprocal, and give-up practices as FF. They recognized, as the SEC did, that unless other similar funds simultaneously changed their reciprocal and give-up practices FF if it changed its practices "would place itself at a disadvantage in competing". [See PPI, Ex. 6, p. 173]. They knew that in its PPI Report of December 2, 1966 the SEC had "given notice that it believes that exchange rules must be changed so as to preclude customer-directed give-ups" [Ex. 6, p. 186]. They, therefore, were not seeking to experiment with untried devices for new uses of give-ups.

93. The directors approved of the statements made in proxy material sent to stockholders and the statements in prospectuses which recited the use made by FF of reciprocals and give-ups. Typical is the following proxy material sent out annually, beginning in 1966, relative to the question of approving continuance of the management contract

"* * * Dealers with whom the principal underwriter has sales agreements may receive or obtain a portion of the customary and standard brokerage commissions on purchases or sales of portfolio securities not only of the Fund but also of other Funds for which Fidelity Manage-

ment & Research Company acts as adviser. The Fund may also buy portfolio securities from, or sell such securities to, dealers acting as principals. The Fund always seeks to effect its transactions in portfolio securities whether acting through a dealer as agent or with a dealer as principal where it can get prompt execution of orders at the most favorable prices. While there is no undertaking or agreement to do so, it is the practice of the Fund so far as it is practicably possible, to consider the following additional factors in the allocation of brokerage business: (1) the relative sales of the shares of all of the Funds for which Fidelity Management & Research Company serves as adviser, and (2) statistical and other factual information provided to the Adviser. These factors are also taken into account where there is no competition among dealers on the basis of price. In no event, however, will these factors be given any weight if this would result in the Fund not obtaining the most favorable price and execution reasonably obtainable.

Allocation as used in the above and the following paragraphs relates to the commissions received by the dealers who execute particular transactions or receipts by a dealer who, although not executing the transaction, receives a portion of the brokerage commission from the dealer who executes the transaction."

94. Plaintiff charges FF's management, particularly Edward C. Johnson 2d, its president, D. George Sullivan, its executive vice president, and Caleb Loring, its general counsel, with having kept the unaffiliated directors ignorant of the possibilities of "recapture" of give-ups, so that the directors were prevented from exercising a business judgment as to courses of action alternative to the use of give-ups to reward and stimulate sellers of fund shares and providers of statistical information.

95. Of course plaintiff's premise is that there were lawful, ethical, and practical alternatives. If the earlier findings are correct plaintiff's premise is wrong, and it would be of no consequence if the officers and counsel of FF failed to inform the unaffiliated directors of the views of those who thought that "recapture" was possible.

96. But even if the earlier findings are mistaken, it cannot rightly be said that the management of FF failed in keeping the unaffiliated directors informed of available, proven, and legal methods of "recapture".

97. To be sure, Sullivan and those who accompanied him to the June 3, 1965 hearing about the Detroit Stock Exchange did not report to the unaffiliated directors the questions that the SEC staff member Silver put; nor did Sullivan and his companions who attended the September 23, 1966 hearing on Commission Rate Structure report to the directors the questions of staff member Rotberg. But it is hard to fault officers and counsel for not telling directors about questions put by subordinate SEC employees who obviously did not see the technical difficulties with suggestions they informally threw out in the course of an investigatory hearing covering principally other topics.

98. The unaffiliated directors, from press accounts and from discussion at FF board meetings, contemporaneously knew about the Pacific exchange's 1965 admission of broker affiliates of Waddell & Reed and three mutual fund complexes. They promptly received a summary of the SEC December 2, 1966 report called PPI. Some of them saw the text of the report. Loring delivered to their counsel Sumner H. Babcock a copy in the very month it was published.

99. It is also clear that the directors knew about the January 26, 1968 release of the SEC. Their counsel, Babcock, talked with Reilly in between his visits to the regional exchanges and received a copy of Reilly's tentative report a few weeks after it was written. Further-

more, Sullivan gave the directors at the March 28, 1968 meeting a quite accurate statement of just what Reilly's investigation showed was necessary—that is, a statement in writing from regional exchanges as to what each was prepared to allow by way of recapture in view of the anti-rebate rules [Ex. 3K, p. 2].

100. There is nothing which warrants plaintiff's accusation that "The Management Company, its officers and stockholders consistently kept from the directors any of the information which might have aroused them from their inaction". [Plaintiff's brief after trial, p. 88].

101. The truth is that director McKenzie, who had a lively interest in reciprocals and give-ups, and who was thoroughly familiar with PPI immediately after its publication December 2, 1966, even made proposals to the board of directors of FF which contemplated that Crosby should under some circumstances share the advantages which it derived from give-ups. After discussion, the Board preferred not to share in Crosby's profit but to take into account the advantages of give-ups as part of "the whole package" when FF made its annual contracts with Crosby as underwriter and with FMR as adviser.

### J. FF Stockholder Attitudes Toward Reciprocals and Give-Ups

102. The directors of FF never submitted to stockholders of FF for their vote the question of approving FF's use of reciprocals and give-ups.

103. However, these brokerage practices were disclosed to new investors in prospectuses and to stockholders in proxy material submitted in connection with annual management contracts submitted for their approval. Previous findings of fact quoted a disclosure appearing in the 1966 proxy material.

104. When plaintiff became a stockholder in December 1960 she received the prospectus of April 28, 1960.

While it was not as discursive as the 1966 proxy material just mentioned, it put her on notice as to the way FF had handled its brokerage. The relevant language follows:

"While there is no undertaking or agreement to do so, it is the practice of the Fund, so far as it is practicably possible while seeking the most favorable prices and execution of orders, to place a portion of such business with eligible dealers, using their relative sales of Fund shares as a factor in the allocation. During 1959 approximately one-half of such business was allocated to eligible dealers who had sold shares of the Fund. In some instances, such business was allocated to dealers who provided statistical and other factual information" [Ex. A–1, p. 5].

105. While only the reciprocal and not the give-up practices are spelled out, and no reference is made to the fact that reciprocity is handled on the basis of the combined sales of all publicly-offered funds in the Fidelity group, the 1960 prospectus indicated that FF's brokerage was used in ways that would have a favorable effect on FF's adviser and FF's underwriter.

### K. Allocation of Brokerage on the Basis of the Combined Sales of, and Statistical Information Supplied to, All Publicly Offered Funds In the Fidelity Group

106. FF in allocating reciprocal business and in directing give-ups took into account the sales of shares of all publicly offered funds in the Fidelity group, not only the sales of FF shares. FF also took into account statistical information supplied to all members of the FF group, not to FF alone.

107. The directors of FF as a matter of business judgment approved this practice. They did so because they thought it the only way to avoid undesirable dealer pressure to sell a fund which at a given point in time had large brokerage relative to its sales. They thought it best for the investors if the

dealers had a steady uniform interest in all the funds. They were mindful that an investor in one Fidelity fund had the option, without paying a commission or like sales charge, to convert shares he had in one Fidelity fund into another Fidelity fund, and that each year conversions amounting to millions of dollars took place [See Ex. A–13]. They were aware that over a long period of time the benefits of group allocation tend to be equally shared by each participating fund.

108. Group allocation is a common practice among funds competitive with the Fidelity group.

109. It is important to realize that what was being pooled was not the value of give-ups (because FF could not get the give-ups in cash or credit) but merely the value to FF of assigning reciprocals and give-ups.

### L. Advisory and Underwriting Contracts

110. In the period now relevant Crosby sold shares of FF pursuant to two contracts with FF: the first is dated December 29, 1961 [Ex. 18–A]; the second, June 1, 1967 [Ex. 18–B]. They are essentially similar.

The 1967 contract [Ex. 18–B] provided:

"1. The Issuer hereby grants to Crosby the right, during the term of this Agreement and subject to registration requirements of the Securities Act of 1933 as amended (herein called the "1933 Act"), to purchase shares of the Issuer and to resell such shares upon the terms and conditions hereinafter set forth. Crosby shall have the right to purchase from the Issuer as principal at a price equal to the net asset value during each period determined as described in the current prospectus the shares needed, but no more than the shares needed (except for clerical errors and errors of transmission), to fill unconditional orders for shares of the Issuer received during such period by Crosby from dealers or investors. Crosby shall resell such shares purchased at a price equal to the public offering price determined as described in the current prospectus less, in the case of a sale to a dealer, the discount allowed the dealer, if any."

"2. The net asset value and the public offering price and the decision of whether or not to impose a sales charge upon a public offering of the shares of the Issuer shall be determined by the Issuer. The net asset value and the public offering price shall be computed in accordance with the Rules of Fair Practice of the National Association of Securities Dealers, Inc. and the current prospectus of the Issuer, and Crosby shall be notified promptly thereof. The public offering price (being the price at which Crosby or dealers may sell shares to the public) shall be an amount equal to such net asset value plus a sales charge, if any, varying with the size of the investment as described in the currently effective offering prospectus of the Issuer; and so long as this Agreement remains in effect the sales charge, if any, and the method of determining net asset value and the public offering price shall not be changed without the written consent of Crosby. The net asset value and the offering price based thereon shall be subject to adjustment in the event of wide fluctuations in market prices, in accordance with the provisions of the Issuer's Articles of Organization, as amended from time to time, and subject to the provisions of the Investment Company Act of 1940 and state laws regulating the sales of securities, and any regulations of the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. and state blue sky commissioners having jurisdiction. If a sales charge is in effect, Crosby shall have the right to enter into uniform sales agreements with dealers of its choice for the sale of shares of the Issuer and fix therein the portion of the sales charge which may be retained by dealers, provided that the Issuer shall approve the form

of the dealer agreement and the dealer discounts set forth therein and shall evidence such approval by filing said form of dealer agreement and amendments thereto as an exhibit to its currently effective registration statement on Form S-5 filed under the 1933 Act."

111. Pursuant to the provision just quoted Crosby entered into uniform sales agreements with dealers [Ex. A–3], setting forth the sales charges and dealer discounts, and providing for payment and delivery of the shares.

112. FF's board of directors approved each of the underwriting contracts.

113. Read together, the underwriting contract, the uniform sales agreement, and the prospectus incorporated by reference show that if he bought from a dealer a purchaser of new FF shares was required to pay the dealer a sales charge of 7½% upon a purchase of less than $25,000 (with a lower percentage for larger amounts). The dealer kept 6%; 1½% was paid by the dealer to Crosby. FF paid no sales charge or commission.

114. The prospectus, which was incorporated by reference, referred to FF's brokerage practices in the very same paragraph that referred to the 6% sales charge the dealer received and to the 1½% that Crosby as underwriter and distributor received. A typical prospectus for the period covered by this case was dated April 29, 1966 [Ex. 17–B–5] which on pp. 6–7 stated:

"Dealers with whom the Distributor has sales agreements purchase shares at a maximum discount of 6% from the offering price to investors on transactions of less than $25,000. The balance of the sales charge is retained by the Distributor. The discount from the applicable public offering price is alike for all dealers except that qualified dealers in foreign countries may purchase shares at a maximum discount of 6¾% in return for translating and distributing sales literature in a particular foreign language within a particular country. Dealers may receive or obtain a portion of the customary and standard brokerage commissions on purchases or sales of portfolio securities not only of the Fund but also of other Funds for which Fidelity Management & Research Company acts as adviser. The Fund may also buy portfolio securities from, or sell such securities to, dealers acting as principals. The Fund always seeks to effect its transactions in portfolio securities whether acting through a dealer as agent or with a dealer as principal where it can get prompt execution of orders at the most favorable prices. While there is no formula, or undertaking or agreement to do so, it is the practice of the Fund, so far as it is practicably possible, to consider the following additional factors in the allocation of brokerage business: (1) the relative sales of the shares of all of the Funds for which Fidelity Management & Research Company serves as adviser, and (2) statistical and other factual information provided to the Adviser. These factors are also taken into account where there is no competition among dealers on the basis of price. In no event, however, will these factors be given any weight if this would result in the Fund not obtaining the most favorable price and execution. The Fund has no intention of placing portfolio business with any particular broker or group of brokers."

115. In approving the contract the unaffiliated directors acted wholly independently of the affiliated directors and at meetings not attended by the latter. Each unaffiliated director was a man of maturity, experience in the world of finance or commerce, reputation extending beyond provincial limits, vigorous mind, and strength of character. None of them was subservient to Edward C. Johnson 2d, or Edward C. Johnson 3d, or D. George Sullivan, or Caleb Loring or anyone else connected with this case. They fully understood the underwriting contracts which they approved. They were aware that the compensation of Crosby (paid by the pur-

chasers of new shares) depended upon the volume of the purchases, that the volume would be increased by rewarding and stimulating dealers who made sales to purchasers, and that the practice (but not the promise) of FF was to furnish stimulants in the form of reciprocals and give-ups.

116. Plaintiff stipulated that she "is not attacking the sales load of the Fund [FF] as excessive" [Ex. 16, par. 6].

117. FF had an advisory contract with FMR at all times during the period now relevant. The 1962 advisory contract between the parties was continued as a result of annual approvals by the already-described independent unaffiliated directors at meetings not attended by the affiliated directors, and then by stockholders to whom was sent proxy material (already quoted in the findings) which expressly referred to FF's brokerage practices and thus informed the stockholder that the brokerage was being used to stimulate the supply of research to FMR and also to stimulate sales of new shares which, of course, would increase FF's assets which constituted one of the factors in FMR's compensation.

118. Plaintiff stipulated that she "is not attacking the fees paid by Fidelity Fund * * * to the advisor * * * as excessive" [Ex. 16, par. 5].

119. In approving the advisory and underwriting contracts and approving fees thereunder the unaffiliated directors took into account that FMR and Crosby had incidental benefits from FF's methods of handling brokerage and give-ups. While FF did not enter into a bargain with FMR or Crosby to continue FF's brokerage practices, FF directors had these practices in mind in estimating the fairness of the methods used in determining FMR's compensation and Crosby's compensation.

120. At all times there was in effect the following provision in paragraph 12 (c) of FF's Agreement of Association:

"Any [investment advisory or distribution] contract * * * may be entered into with any corporation, firm, trust or association, although one or more of the Board of Directors or officers of this corporation may be an officer, director, trustee, shareholder, or member of such other party to the contract, and no such contract shall be invalidated or rendered voidable by reason of the existence of any such relationship, nor shall any person holding such relationship be liable merely by reason of such relationship for any loss or expense to the corporation under or by reason of said contract or accountable for any profit realized directly or indirectly therefrom, provided that the contract when entered into was reasonable and fair and not inconsistent with the provisions of this paragraph 12."

III

Opinion Incorporating Conclusions of Law.

A. *Issues Presented, Jurisdiction, and Burden of Proof.*

The introduction preceding the findings of fact recited the four principal questions presented by this action. This formulation has not previously appeared in this case. It represents the court's understanding of the issues both raised by the evidence and canvassed by the parties in their briefs. But it is not wholly responsive to the present state of the pleadings which first, cover much that has been abandoned by stipulation [See Ex. 16], or that has not been supported by testimony or argument, and second, omit specific theories and statutory references which all the parties treat as being before the court.

No doubt, it would be appropriate to allow the parties to amend the pleadings to conform to the evidence. F.R.Civ. Proc. 15(b). The preparation of this opinion could be postponed until the record was in an appropriate posture. However, Rule 15(b) provides that "When issues not raised by the pleadings are tried by express or implied consent of the parties they shall be treated in all respects

as if they had been raised in the pleadings."

On that basis, it may fairly be said that plaintiff alleges that she was injured by defendants or some of them having violated

(a) section 36 of the Act which authorizes the SEC to procure injunctive relief against a registered mutual fund's officers, directors, investment adviser, and principal underwriter if they have "been guilty * * * of gross misconduct or gross abuse of trust in respect of" a registered investment company,

(b) section 37 of the Act which provides that "Whoever steals, unlawfully abstracts, unlawfully and wilfully converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company shall be deemed guilty of a crime,"

(c) section 15 of the Act which, *inter alia,* makes it unlawful (1) for an investment adviser, such as FMR, to advise a registered mutual fund except pursuant to a contract in which there is "precisely described all compensation to be paid thereunder" [sec. 15(a) (1) of the Act] and (2) for a principal underwriter, such as Crosby, to sell shares of a registered mutual fund "except pursuant to a written contract" [sec. 15(b) (1) of the Act], and

(d) their general fiduciary duties which she traces to the preamble of the Act, or alternatively to a federal common law which she supposes the federal courts may develop now that Congress has regulated the investment trust business, or alternatively to the law of the Commonwealth of Massachusetts where FF is incorporated.

■ Insofar as plaintiff alleges that she was injured by violations of sections 15, 36, and 37 of the Act, this court clearly has jurisdiction. Levitt v. Johnson, 334 F.2d 815, 819 (1st Cir.); Brown v. Bullock, 294 F.2d 415, 418 (2nd Cir.);

Cf. J. I. Case v. Borak, 377 U.S. 426, 430–431, 84 S.Ct. 1555, 12 L.Ed.2d 423; section 44 of the Act, 15 U.S.C. sec. 80a–43; 28 U.S.C. sec. 1331.

■ Insofar as plaintiff alleges that she was injured by a violation of fiduciary duties traced to the preamble of the Act, that is section 1 of the Act, 15 U.S.C. sec. 80a–1, she does not assert a substantive claim under the Act or under any of the laws of the United States. See Moore C. J. dissenting in Brown v. Bullock, supra, 294 F.2d at p. 425. That aspect of her claims fails both on the merits and for want of jurisdiction under 15 U.S. C. sec. 80a–43, or 28 U.S.C. sec. 1331, or otherwise.

Plaintiff's allegation that she was injured by defendants' violations of an uncodified or common law of the United States is not so easily dismissed. It is conceivable that since Congress has regulated the investment trust business, the federal courts may have the power to develop a common law which shall be in accord with the preamble and policy of the Investment Company Act of 1940, which shall fill in the interstices left by Congress, and which shall secure national uniformity. Such a conception would be an extension of the doctrine of Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838.

■ But not every transgression by directors of a registered company necessarily gives rise to a federal claim. Brown v. Bullock, supra, 294 F.2d, at p. 418. See Colonial Realty Corporation v. Bache & Co., 358 F.2d 178, 183 (2nd Cir.). Usually, the mere fact that Congress has regulated an industry does not give federal courts power to shape a federal common law with respect to transactions therein, but instead leaves such transactions to state law. Pan Am. Petroleum Corp. v. Superior Court of Del. In and For New Castle County, 366 U.S. 656, 663, 81 S.Ct. 1303, 6 L.Ed.2d 584. The usual rule would seem suitable in connection with those alleged breaches of fiduciary duty which arise out of intercorporate transactions and interlocking

directorates in the investment trust industry but which are not within the scope of sections 36, 37. If Congress had wanted to have a federal rule for minor abuses as well as for those grave abuses which are covered by sections 36 and 37, it easily could have so declared. Its silence is negatively pregnant. Moreover, there is little reason, except uniformity, to prefer a federal to a state common law. In this area the state courts have many precedents drawn from a variety of fiduciary and business activities, and reflecting the special gifts of some of the nation's most talented judges.

If it were necessary to decide the issue, this court would reach the conclusion that the claimed federal common law does not exist. A careful reading of SEC v. Aldred Investment Trust, 151 F.2d 254 (1st Cir.), which has been cited to the contrary, would show that the court there was concerned with violations not of a supposed federal common law, but of section 36 of the Investment Company Act authorizing injunctions against gross abuse of trust. However, it will appear later that the facts in the case at bar do not involve any breach of fiduciary duty even if there is a federal common law governing the actions of these defendants. So, unless an appellate court takes a view of the facts or law different from this court, it is a moot question whether there is a federal common law governing fiduciaries' transactions with mutual funds.

Plaintiff's claims under state law and plaintiff's claims of alleged violations of sections 36 and 37 of the Act "derive from a common nucleus of operative fact" and as such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding". United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218. Therefore this court may exercise pendent jurisdiction over the state claims.

 But plaintiff has failed to allege a claim that meets the substantive standard of Massachusetts. Her amended complaint concedes that she has failed to make demand upon the directors or

shareholders of FF before she brought this derivative suit. Not having done so, under Massachusetts law she does not state a cause of action in a stockholder's derivative action seeking a remedy for wrongs allegedly done to her corporation. Palley v. Baird, 1970 Mass.Adv. Sh. 41, 254 N.E.2d 894; S. Solomont & Sons Trust, Inc. v. New England Theatres Operating Co., 326 Mass. 99, 114, 93 N.E.2d 241; Pomerantz v. Clark, 101 F.Supp. 341, 343 (D. Mass.).

Since only federal law is here involved, federal rules with respect to burden of proof govern. Ordinarily where the fairness of transactions between corporations having common directors or between a corporation and its director or officer is challenged, the burden of proof is upon those whose transactions are challenged to show their fairness. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425; Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Pappas v. Moss, 393 F.2d 865, 867 (3rd Cir.). But in a memorable case, Ewen v. Peoria & E. Ry. Co., 78 F.Supp. 312 (S.D.N.Y.), Judge Learned Hand, distinguishing decisions such as *Geddes* on the ground that they "dealt with occasions upon which the fiduciary * * * had not been authorized to deal with his principal", held that "in situations in which the [charter] permitted the directors to deal with the company" the burden of proof is on the beneficiary [78 F.Supp. at p. 317]. He applied his exception to the *Geddes* rule in a case where the New York Central Railroad had entered into an agreement with Peoria to which Central bore a fiduciary relation because it owned a majority of Peoria's stock and dominated Peoria. The agreement gave Central power to allocate traffic, business, and revenues between the two railroads. Investors in Peoria who challenged the allocation made by Central were held to have the burden of proof.

If the *Ewen* case be acceptable doctrine in this circuit it fits this case. But a District Judge, mindful of the conflict in circuits reflected in Pappas v. Moss,

supra, had better see whether in the case before him the matter of burden of proof is moot. Here, as will appear, defendants are entitled to prevail even if the burden of proof on every issue rests upon them. So this court treats the burden of proof question as moot.

It now becomes appropriate to consider each of the four questions presented.

### B. The Claim That There Was Not Best Execution.

The first principal substantive issue is whether the defendant directors and the defendant management company (FMR) in placing FF's brokerage on a reciprocal basis violated a statutory or non-statutory duty to secure for the fund the best execution of its purchase and sale orders.

As stated in the findings of fact, defendants have borne the burden of proving that FF achieved, as a matter of regular practice, best execution. This makes it unnecessary to decide whether if directors and managers failed to secure best execution they would have violated sections 36 and 37 of the Act or a federal common law duty.

Whatever law governs, this court must conclude and does conclude as a matter of law that the facts prove that defendants did not violate statutory or non-statutory law by any failure to secure for the fund the best execution of its purchase and sale orders.

### C. The Claim That Give-Ups Could Have Been "Recaptured".

The second issue is whether the defendant directors and the defendant management company in using the give-ups to stimulate sales of fund shares and supply of statistical information violated a statutory or nonstatutory duty to secure for the fund a greater benefit by using the give-ups in some other way, such as by directing them to the fund's underwriter, or to a stockbroker affiliated with the fund or its management.

This issue requires a searching inquiry into the nature of customer-directed give-ups and so-called recapture methods. The labels which have been given by the securities industry conceal the critical fact that in reality each is a rebate of the very type that conflicts with the words and the policy of the minimum commission rate and rebate rules which are the cornerstone of every stock exchange constitution.

When in 1792 the New York Stock Exchange was organized a principal object was to maintain a minimum rate structure. [See Ex. 8, "Report of Special Study of Securities Markets of the Securities and Exchange Commission," H.R.Doc.No.95, pt. 2, 88th Cong., 1st Sess. (July 17, 1963) (hereafter called "Special Study"), p. 295]. The founders' avowed purpose was to eliminate competition based solely on price-cutting.

It was not inconsistent with the letter or the spirit of the minimum commission rates and rebate rules to tolerate the ancient and respectable practice of broker-directed give-ups. [See Ex. 6, "Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth", H.R.Doc.No.2337, 89th Cong., 2nd Sess. (December 2, 1966) (hereafter called "PPI") p. 169]. When an executing broker directs a give-up to another broker his purpose is to reward him for participating in bringing about the very transaction which earned the commission which is being split. No benefit flows to the customer.

A customer-directed give-up, while verbally similar, has a wholly different purpose and effect. When an executing broker at the direction of his customer gives up part of the commission to another broker who has not participated in the transaction which earned the commission which is being split, the executing broker is surrendering a power of assignment to the customer. Thus the executing broker is giving the customer a rebate. [Cf. Ex. 8, Special Study, Part 2, p. 317, last paragraph and also note 569 which does not appreciate that both the assignor-customer and the assignee-broker are receiving rebates]. Indeed if

it were not true that the customer gets by rebate a power of assignment there would be no plausibility to most of plaintiff's complaint which, as her brief stresses, is bottomed on the quite correct assumption that the directors and managers of FF held a power to assign give-ups as a power in trust. [Plaintiff's brief after trial, p. 8 and p. 17A].

No court has yet decided, and this court finds it unnecessary to decide, whether the customer-directed give-ups for the benefit of broker-dealers which were both customary and widely practiced before December 5, 1968 were lawful or unlawful. In any event, a customer-directed give-up which was not used to establish a credit for a customer is no precedent for a customer-directed give-up which does establish such a credit.

Most of the devices described in parts F and G of the findings of fact (such as an assignment to an affiliate of the customer to form the basis of a credit to the customer), and to which plaintiff and some others give the name "recapture methods", are rebates. They are forbidden by the text and the policy of the minimum commission structure and anti-rebate rules, of which Article XV, section 1 of NYSE (quoted in the findings of fact) is the prototype. Those devices have the evil consequence of giving back to the customer a dollar credit traceable directly or indirectly to the commission he paid.

Inasmuch as an anti-rebate rule is the type of stock exchange rule which has the force of law and is binding alike upon members and customers of the exchange [Silver v. New York Stock Exchange, 373 U.S. 341, 360–361, 83 S.Ct. 1246, 10 L.Ed.2d 389; Colonial Realty Corporation v. Bache & Co., 358 F.2d 178, 181–182 (2nd Cir.)] all recapture devices which are contrary to the anti-rebate provisions of exchange constitutions are illegal.

No federal statute and no rule of federal non-statutory law would require directors and managers of a fund to use their fiduciary power to secure for the fund the advantages of illegal recapture devices, or even of devices which are not clearly lawful. A fiduciary is under no duty to engage in legally doubtful experiments virtually unsupported by custom or convention or court decision.

The principle just stated disposes of most, but not all, of the second issue raised in this case. Broker-affiliations remain for consideration.

First, it would be lawful for directors of a mutual fund to contract to have the fund managed and advised by a brokerage concern which did a general business for the public. Such a firm could reduce its advisory charges by brokerage commissions to the extent permitted by NYSE's so-called "Rule 440A".

Second, it would be lawful for the directors of FF and of FMR to agree that FMR should acquire as an affiliate a NYSE stockbroker which was engaged in a general business for the public, and for FMR to credit against the advisory fee charged FF an amount equal to such part of the net profits which FMR derived from the broker-affiliate as were traceable to the brokerage business FF placed with the broker-affiliate.

Third, similar arrangements with a management company other than FMR would be lawful.

Quite apart from whether FF could readily find a broker, or a broker-affiliate, or a management company which wanted to enter into any of the three hypothetical arrangements just suggested (for none of which, except possibly the first, there seems to be any precedent in the business world), the directors of FF long ago determined they did not want FF involved in any situation in which FF's investment adviser and manager would have a stake in, and be intimately intertwined with, a brokerage business.

Such a determination, as the SEC recognized in SEC Exchange Act Release No. 8746 (Ex. A–64), quoted in the findings of fact, is one which directors acting in good faith and rationally

are free to make. A bona fide, plausible directors' decision of that kind can not be made the basis of liability of any defendant in this case. Black v. Parker Manufacturing Co., 329 Mass. 105, 112–113, 106 N.E.2d 544; Lincoln Stores v. Grant, 309 Mass. 417, 34 N.E.2d 704; Shlensky v. Wrigley, 95 Ill.App.2d 173, 237 N.E.2d 776, 779, 781.

From what has been said it follows that this court must conclude, and does conclude as a matter of law, that the defendant directors and the defendant management company in using the give-ups to stimulate sales of fund shares and supply of statistical information made a reasonable business judgment which they were authorized to make and for which they cannot be held liable. They did not violate a statutory or non-statutory duty by failing to use a broker-affiliate, or by not using the give-ups to secure unlawful rebates, or by not using any other imaginary or imaginable untried device which conceivably might have secured for the fund a greater benefit than the benefit (in the form of growth of the fund) which flowed to it from the tolerated use of give-ups to reward and stimulate sellers of Fidelity group shares and providers of statistical information to FMR.

### D. The Claim That FF's Assets Were Mingled With Assets of Other Fidelity Group Funds.

The next question is whether the directors and managers of FF in taking into account sales of shares of, and information furnished to, the eleven other funds in the Fidelity group, when they placed FF's brokerage on a reciprocal basis and directed give-ups violated a statutory or nonstatutory duty not to mingle the assets of different trusts. Once the facts are understood it is hard to see how it can plausibly be contended that as fiduciaries the directors and managers of FF could be charged with dereliction of duty.

What the directors and managers of FF pooled was not (as plaintiff's brief after trial, p. 70, contends) give-ups and reciprocals. FF did not have, and lawfully could not acquire for itself in cash or credit, the give-ups or any other portion of the commissions it paid to brokers. The anti-rebate rules stood in the way. All that the directors and managers of FF held in trust was the power to assign brokerage commissions and give-ups derived therefrom. The *res* was the mere power of assignment. The power of assignment was limited so that the assignee had to be a member of an exchange or, on some regional exchanges, either an approved non-member of the exchange (Pacific) or an NASD member (Boston, Detroit, PBW). Moreover, the power could not be exercised as payment for anything in the past or in the future with one exception. It was, at best, lawful to assign give-ups as a reward for past sales of shares and past supplies of statistical information and as a stimulus for future sales of shares and future supplies of statistical information. The only advantage to FF from holding this power was to promote cash flow through new sales, growth in the size of the fund, and the acquisition of information by its management company FMR. The monetary value to FF of this power was minimal. It was so insignificant that the SEC and the stock exchanges did not even see its status as a rebate.

More important, the pooling of FF's power of assignment with the powers of assignment held by the other eleven funds far from diminishing its value increases it. So far as concerns statistical information, the powers of assignment were used to encourage supplies of information to FMR. It was to FF's benefit for its adviser to get as much research assistance as possible, and the pooling furthered that result. So far as concerns encouragement of sales of shares, the advantages of pooling are also clear. What FF wanted was a steady flow of customers for its new shares. FF's need for new shareholders would be at a low point in a period following a period of high sales of FF

shares, and at a high point in a period following a period of low sales. It was much better, therefore, not to have too close a correlation between a dealer's most recent performance and the amount of his next receipt of reciprocals and give-ups. Averaging was a far more satisfactory method. The pooling was one way of averaging.

Moreover, the pooling promoted administrative convenience and economy and appealed to dealers who were used to similar practices of other funds and who were the persons whose encouragement was the only possible lawful use of the give-ups. The directors of FF considered those and other advantages and, as a matter of business judgment, favored pooling.

Inasmuch as the pooling was fair to all the funds and furthered the only purposes for which customer-directed give-ups may be lawful, this court concludes that defendants cannot be held liable for adopting that course which they pursued pursuant to a reasonable exercise of business judgment. Western Pac. R. R. Corp. v. Western Pac. R. R. Co., 197 F.2d 994 (9th Cir.); Case v. N. Y. Central R. R. Co., 15 N.Y.2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643; Meyerson v. El Paso Natural Gas Co., Del. Ch., 246 A.2d 789.

## E. The Claim That The Underwriting And Advisory Contracts Violated Section 15 of the Act.

The fourth question presented is whether defendants in omitting from the text of the investment advisory and underwriting contracts of FF sufficient reference to reciprocal and give-up practices they followed rendered those contracts invalid under section 15 of the Act.

First the underwriting contracts made with Crosby are to be considered.

The quick answer to the attack on that type of contract is that by incorporating the prospectus it does make sufficient reference to "reciprocal" and "give-up" practices. Those names are not used, but the description of FF's brokerage is sufficient to inform the reader that, provided it can get prompt execution of orders at the most favorable prices, FF allocates its brokerage to reward those who sell shares of any of the Fidelity funds and those who supply statistical information to FMR. This is an indication that FF uses its brokerage to stimulate the sales for which Crosby is entitled to charge under the contract.

Quite rightly, the prospectus also says that this brokerage practice is only a practice and that "There is no formula or undertaking or agreement" of FF to maintain such practices. Continuation of that practice was no implied part of the underwriting contract. This became plain when, effective December 5, 1968, the New York and other stock exchanges abolished customer-directed give-ups. The abolition did not result in termination or modification of the underwriting contract.

There being no basis in fact for plaintiff's contention that Crosby was not acting "pursuant to a written contract" when it sold FF shares, this court concludes as a matter of law that plaintiff's claim fails to show any violation of that provision of section 15(b) of the Act which makes it "unlawful for any principal underwriter for a registered open-end company to * * * sell * * * any security of which such company is the issuer, except pursuant to a written contract".

Next are to be considered the advisory contracts made with FMR.

The contracts admittedly show precisely how FMR's financial compensation is to be calculated. And it has been stipulated that fees paid pursuant to the disclosed formula are not attacked as excessive. What plaintiff claims is that the contracts do not disclose the research information FMR gets as a result of FF's brokerage, and that they do not disclose that FF's brokerage is being used to increase sales of FF's shares and thus to increase FF's assets which con-

stitute one of the factors in determining FMR's compensation.

There are many reasons that the claim must fail.

■ The research information given by brokers to FMR was not "compensation to be paid" [See section 15(a) (1) of the Act] by anyone to FMR. At most FMR was an incidental beneficiary of arrangements between the brokers and FF. The information was given to FMR for FF's benefit not with the purpose of benefitting or compensating FMR. FMR had no legal right to demand such research information. Neither FF nor the brokers had a legal duty to supply it to FMR. When give-ups were discontinued after December 5, 1968, no one supposed that an implied condition of the advisory contract had been broken and that FMR's fee had to be adjusted accordingly.

■ Insofar as plaintiff contends that the advisory contracts should have shown how brokerage might affect the total fees received by FMR, she is clutching at straws. The contract discloses the precise formula upon which FF is to pay FMR. The formula being clear it is unnecessary, and indeed probably impossible, to list or describe how the impact of that formula may be affected by each of the activities of the parties. For example, FF surely would be imprudent if it tried to predict how much its assets would be increased in the next year by the sale of new FF shares stimulated by FF brokerage practices. FF in advance cannot even guess how eager persons will be to buy shares in mutual funds in the next year, or how much brokerage FF will have, or how much of that brokerage will go to the third market on the principle of best execution. Hence reference to brokerage practices would not add precision to the already revealed basis on which FMR is to be compensated.

Moreover, it is plain that FF did not try to hide the benefits FMR got from brokerage. The proxy material, already quoted, tells the story adequately.

Upon the basis of the facts found, this court's conclusion of law is that defendants FMR did not violate the provision of section 15(a) (1) of the Act making it "unlawful for any person to serve or act as investment adviser of a registered company, except pursuant to a written contract, which contract * * * (1) precisely described all compensation to be paid thereunder."

*F. The Claim That Johnson 2d, Johnson 3d, FMR and Crosby Hold Their Profits Upon a Constructive Trust for FF.*

Plaintiff claims that Edward C. Johnson and his son as directors of FF, FMR as its adviser, and Crosby as its underwriter, were all in violation of their fiduciary duties when they caused FF to place its brokerage on a reciprocal basis and to direct give-ups to brokers who had sold Fidelity fund shares and who had supplied FMR with research information, and that the profits the two directors and the two companies derived from so placing brokerage and directing give-ups were held upon a constructive trust for FF.

Plaintiff relies upon the principle stated in Restatement, Restitution sec. 190:

"Where a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other."

Reference is also made to Restatement, Restitution secs. 1, comment (c), 138, and 197, Restatement, Agency secs. 387, 388, and 404A, Restatement, Trusts 2d, secs. 170, 203, 205 and 206, 2 Scott on Trusts (3rd ed.) sec. 170.22.

■ To this claim the complete answer is that none of the named defendants acted in violation of his or its duty. Their obligation was to place the brokerage so as to secure best execution and to get for FF what lawfully could be derived from the give-ups for the benefit of FF. It was not their duty to adopt unlawful recapture or rebate methods.

It was not their duty to cause FF to place its business with a broker adviser or broker affiliate, inasmuch as that was contrary to the business judgment of FF's directors.

Furthermore, the advantages which Crosby and FMR and the Johnsons as stockholders of FMR derived from the way FF placed its brokerage were taken into account when FF entered into its advisory and underwriting contracts, and were the consequence of procedures disclosed to shareholders in prospectuses and proxy material. This is not the case of a profit derived by a fiduciary who commits a breach of trust. It is the case of an incidental benefit which comes to fiduciaries without the violation of any obligation, but rather as a consequence of contracts lawfully made between the beneficiary and the fiduciaries.

Amended Complaint dismissed on the merits.