Rose MOSES, Plaintiff, Appellant,

v.

C. Rodgers BURGIN et al., Defendants, Appellees.

No. 7745.

United States Court of Appeals, First Circuit.

June 4, 1971.

As Amended June 23, 1971.

Abraham L. Pomerantz, New York City, with whom William E. Haudek, Richard M. Meyer, Pomerantz Levy Haudek & Block, New York City, and Avram G. Hammer, Boston, Mass., were on the brief, for appellant.

Edward B. Hanify, Boston, Mass., with whom George C. Caner, Jr., Edward P. Lawrence, John S. Hopkins, III, Elizabeth Paine, Ropes & Gray, Joseph P. Rooney, and Gaston, Snow, Motley & Holt, Boston, Mass., were on the brief, for Edward C. Johnson 2d, Edward C. Johnson 3d, Fidelity Management & Research Company, and the Crosby Corporation appellees.

Sumner H. Babcock, Boston, Mass., with whom Richard F. McCarthy and Bingham, Dana & Gould, Boston, Mass., were on the brief, for C. Rodgers Burgin, George R. Harding, Gilbert H. Hood, Jr., and Ronald Jones, appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

Plaintiff Moses, a shareholder of Fidelity Fund, Inc. (Fund), a Massachusetts-incorporated investment company, in December 1967 filed a complaint, and in November 1968 an amended complaint, in this derivative action. Fund is an open-end mutual fund, registered under the Investment Company Act of 1940, 15 U.S.C. §§ 80a–1 et seq. Defendants, in addition to Fund, are Fidelity Management and Research Company (Management), Fund's investment adviser; The Crosby Corporation (Crosby), a wholly owned subsidiary of Management and sometimes included within that term, an underwriter whose sole business is selling shares of Fund to independent broker-dealers; E. C. Johnson 2d, president and director of Fund, and president, director and principal voting stockholder of Management; E. C. Johnson 3d, director of Fund since April 1968, and director and substantial voting stockholder of Management; and C. R. Burgin, G. R. Harding, G. H. Hood, Jr., R. Jones, G. K. McKenzie and H. Schermerhorn, who are or were directors of Fund who claim not to be "affiliated" within the meaning of section 10(a) of the Act, 15 U.S.C. § 80a–10(a), hereinafter the unaffiliated directors.[1] Although the last two were named as defendants, the action has been dismissed against them for lack of service of process. Other dramatis personae, not defendants, include D. G. Sullivan, a vice-president of Management and Fund and since April 1968 a director of Fund; C. Loring, Jr., an officer of Fund and counsel for, and a non-voting stockholder of, Management; and S. H. Babcock, retained in December 1966 as counsel to advise the unaffiliated directors.

Plaintiff complained of various breaches of fiduciary duty allegedly imposed by the Investment Company Act and the common law. Following an extensive trial on liability only, the district court resolved all ultimate issues against her. 316 F.Supp. 31. Plaintiff appeals. The record is voluminous, the briefs lengthy and detailed, and the sums of money involved substantial. Many of the claims advanced in the district court are no longer pressed. Before us plaintiff makes one principal complaint, that Fund could, and should, have recovered a portion of the brokerage commissions it was obliged to pay on its so-called portfolio business, viz., on the purchases and sales of the securities in which it invested its assets. Plaintiff's proposals as to how this should have been accomplished require a considerable review of Fund's method of operation.

Fund's shareholders are numbered in five, and its assets in the upper nine, figures. The amount of its assets, apart from changes in the market value of its investments, depends upon the number of shares that it can sell as against the number it must redeem. Both activities are continual. The purchasers of indi-

1. Plaintiff has not successfully attacked the court's finding (F. 115) that these defendants were legally unaffiliated and factually independent. Whether, in some measure, they abdicated their responsibilities we will consider later.

vidual participating interests, or shares, pay their net worth in terms of the current value of Fund's assets, plus a 1½% sales charge to Crosby and a brokerage commission of 6%.[2] In reponse to advice by Management, Fund is constantly changing its portfolio. This is done through independent broker-dealers, and mostly involves trading by them on the New York and regional stock exchanges. The conclusion of a trade is commonly referred to as execution. A claim made in the district court was that defendants, in choosing their brokers, or other trading methods not presently pertinent, did not always obtain best execution. The court resolved this issue against plaintiff, from which no appeal is taken.

The exchanges, at all relevant times, set required commission rates, with no quantity discounts. Because of the size of many mutual fund transactions brokers competing for business were willing to give up a portion of the commissions they received from the fund. "Anti-rebate" rules adopted by every exchange prevented any rebate or discount, direct or indirect, that would bring the net commission paid below the minimum level set by the exchange. As will be described, the total effect of these rules was in doubt, but they at least prevented direct cash refunds to the customer. On Fund's instructions, at Management's behest, the so-called customer-directed give-ups were paid over to brokers who sold shares of Fund acquired from Crosby to the public, in proportion to their success, in order to stimulate sales.[3] Customer-directed give-ups are to be distinguished from broker-directed give-ups, a long-recognized practice whereby two or more brokers who have shared in the work divide the commission between themselves. Give-ups which are customer-directed (which is what we shall mean by the term "give-up" hereafter) are inherently and necessarily, as the district court found, in the nature of a refund, or rebate to the customer.[4]

Plaintiff's complaint is double-barreled. First, she complains of Fund's give-up practices because they resulted in the loss of the value of brokerage commissions which could have been recaptured. She claims recapture was possible either by creation of a broker affiliate that could participate in Fund portfolio transactions, or by channeling present give-ups to an affiliate, with the result that in either case the sums involved would be credited to Fund. Second, she complains that the give-up practices, pursued to the exclusion of either course she suggests, benefitted Management and Crosby, since stimulating sales of Fund's shares increased Crosby's commissions, and increased Management's advisory fee, which was measured by the size of Fund's portfolio. Accordingly, plaintiff claims that Management and the two Johnsons, who together owned 90% of its voting stock, were using Fund's assets to their own private advantage. More pointedly, she claims in particular that Fund's board never considered these possibilities because relevant information regarding them was improperly withheld from the unaffiliated directors by the Management defendants.[5] Recovery is sought, inter alia, under section 36 of the Investment Company Act, 15 U.S.C.

2. There are quantity discounts in these charges, a matter not presently relevant.

3. To a lesser extent give-ups were also used to reward brokers who supplied statistical information to Management for use in making investment decisions.

4. "When an executing broker at the direction of his customer gives up part of the commission to another broker who has not participated in the transaction * * the executing broker is giving the customer a rebate."

5. Plaintiff also complains of the use of "reciprocals," a practice by which Fund, at Management's direction, awarded some of its portfolio business to particular brokers in proportion to their success in selling Fund shares to the public. On the district court's unexcepted-to findings that the execution of Fund's portfolio business was always satisfactory we do not see how reciprocals are involved on this appeal. Whereas furthering sales of its own shares may not have warranted an expense to Fund, reciprocals, as such,

§ 80a–35. To prevail on this appeal plaintiff must persuade us that the district court's rulings were wrong and that its factual findings in defendants' favor were clearly erroneous. Plaintiff openly accepts this burden.[6]

### Jurisdiction

■ Before coming to the merits we consider briefly the district court's jurisdiction. Defendants contest vigorously plaintiff's claims that the Investment Company Act establishes a general federal common law of fiduciary obligation, or that she has a valid claim, by way of pendent jurisdiction, under Massachusetts corporate law. We reach neither of these questions, since we see no way in which they would change the result. Defendants do not seriously dispute that the Act impliedly authorizes the courts to grant civil recovery if their conduct fell within the scope of the phrase "gross misconduct or gross abuse of trust" contained in section 36 of the Act, 15 U.S.C. § 80a–35.[7] We agree with the district court that we have jurisdiction at least to that extent. Brown v. Bullock, S.D.N.Y., 1961, 194 F.Supp. 207, 245, aff'd under other sections, 2 Cir., 294 F.2d 415; cf. J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 430–433, 84 S.Ct. 1555, 1559, 12 L. Ed.2d 423.

■ *Case* relied on a general grant of jurisdiction to "enforce any liability or duty created by" the act in question, a provision identically repeated in section 44 of the Investment Company Act, § 80a–43. Further, it is apparent that the purpose underlying section 36 included protection of shareholders against self-dealing by the managers. *See* section 80a–1(b), quoted post. This can best be accomplished if recourse to the courts is available to private parties who have been thus wronged, as well as to the SEC. *See* Note, The Mutual Fund and Its Management Company, 71 Yale L.J. 137, 152 and nn. 74–75 (1961) (SEC requests private rights of action for effective enforcement of the Act). Our finding of a private right of action is in accord with the majority of the courts that have reached this question. *See* Esplin v. Hirschi, 10 Cir., 1968, 402 F.2d 94, 103, cert. denied, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (concerning the Investment Company Act in general); Brown v. Eastern States Corp., 4 Cir., 1950, 181 F.2d 26, cert. denied, 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631 (also concerning the Act in general) (by implication); Tanzer v. Huffines, D.Del., 1970, 314 F.Supp. 189, 193; Brown v. Bullock (district court opinion), ante. But see Brouk v. Managed Funds, Inc., 8 Cir., 1961, 286 F.2d 901, dismissed, 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 with which compare Greater Iowa Corp. v. McLendon, 8 Cir., 1967, 378 F.2d 783, 789–790.

### The Duty To Recapture

The brief filed on behalf of Management, Crosby and the two Johnsons states,

cost it nothing. We see no reason to reject the SEC's conclusion that awarding reciprocals even to brokers who have done nothing to benefit the funds is unobjectionable if it "does not in any way operate as a detriment to the funds and if the funds have themselves derived as much as they can from these benefits." Securities & Exchange Comm'n, Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., 1st Sess. pt. 4 at 214. This is not to say that granting reciprocals in some particular instance may not conflict with the duty to recapture. See post.

6. We are urged at length by defendants, in common with most appellees who come before us with findings in their favor,

that we have no power to review the evidence de novo. We recognize this, and strive not to do so. This is not to say, however, that we cannot reverse findings which are unsupported by the evidence, or which are so contrary to the great weight of the evidence as to compel the conclusion that a manifest error has been done, and in such circumstances make the opposite finding. Nor does it mean, where no finding has been made at all, that we cannot make our own finding, provided that the great weight of the evidence would compel such a conclusion.

7. This section has since been amended, 84 Stat. 1413 (1970), 39 U.S.L.W. 93, 98, in part to make explicit certain private rights of action.

"The court found that it was the directors' common business judgment that encouraging sales would promote a net cash inflow and growth of the Fund beneficial to the shareholders."

Calling this a "policy decision to promote sales" the brief added that the court found that the directors believed that Fund's awards of give-ups to brokers who sold its shares to the public enhanced its sales. Management's implication,[8] which in oral argument it emphasized to the point of affirmation, was that, if recapture was in fact practical, the directors still had a right to choose between recapture of the give-ups for Fund's direct benefit, and awarding them to brokers for its indirect benefit. We hold, however, that if recovery was freely available to Fund, the directors had no such choice.

■ Fund's charter required that upon sale of its shares it receive their full asset value. The obvious purpose was to prevent the value of the existing shareholders' interest in the assets from being diminished by the addition of further participants. If Fund receives the asset value of new shares, but at the same time rewards the selling broker with give-ups that it has a right to recapture for itself, then the net income Fund receives from the process of selling a share is less than asset value. The existing shareholders have contributed—by paying more than otherwise necessary on Fund's portfolio transactions—to the cost of the sale, which was supposed to have been borne by the new member alone. We cannot, therefore, consider absolving the defendants, if we find that they have violated any duty owed the Fund, by finding that directing give-ups to brokers benefitted Fund by stimulating sales of its shares. Such application violated its charter if it would have been practicable to obtain the give-ups for the direct benefit of its treasury.

Management counsel ultimately conceded this during oral argument. We have dwelt upon it to show that the concession was correct. This is not, of course, to say that the court was not justified in finding that it was beneficial to existing shareholders to promote sales of Fund's shares, as well as being beneficial to Management and to Crosby. It is merely that, by the terms of the charter, Fund cannot use free money, or credit, to pay brokers for sales. Sales are Crosby's business. Whether, during the period covered by the complaint, it was practical for Fund to recover commissions for its direct use is another matter.

### Broker Affiliation

There are a number of methods of mutual fund operation. In general, as has been pointed out, management is placed in the hands of an independent entity. Beyond that, some funds sell their participating shares through a captive sales force and others, including Fund, through independent brokers. Some conduct their portfolio business through the same entity that furnishes them with investment advice, while many, like Fund, use independent brokers. There are basic, fundamental differences in the operational problems, and risks to the fund, resulting from the use of affiliated, versus independent, brokers for portfolio transactions. Some of these are dealt with in detail in the district court's comprehensive opinion. We see no purpose in further elaboration. Suffice it to say that a change from independent brokerage to an affiliated broker is not a matter to be lightly undertaken.

■ It is in this vein that we must see plaintiff's contention that Fund should have decided to have an affiliated broker since recapture could have been effected by having Crosby, or some new subsidiary of Management, become a broker member of an exchange. Plain-

8. As, for example, by the reference in Management's brief to "a community, rather than a conflict, of interest in sale of Fund shares." The conflict, of course, was who was to pay for it.

tiff puts this point with something less than full clarity. Insofar as a fund has a broker affiliate which acts as its executing broker, no question of give-ups arises at all; the issue is the possibility of recapture of the affiliate's profits. It is true that if the broker-affiliate was not used as the fund's exclusive trader, there would in addition be the possibility of using the affiliate to recover give-ups resulting from trading through other houses, and recapturing these as well. It is only too clear, as the court found, that the unaffiliated directors had noted the general risks attendant upon a brokerage operation, especially the risk of loss of best execution, and they had long decided against it. The court found, on adequate evidence, that there were sound business reasons for this decision. We agree; the directors had no duty to pursue plaintiff's suggested course of action, and without their doing so, recapture was not freely available. Plaintiff knew of Fund's practice when she bought her shares; she could have chosen a fund that did have an affiliated broker.

While the court found that the unaffiliated directors learned, in 1965, of the Pacific exchange's admission of broker-affiliates and had in fact rejected such an operation, there is evidence that some of them did not consider, when deciding, the full possibility of thereby recapturing the broker's profits and give-ups accruing from trading with other houses. The court did not specifically address itself to that question. We cannot find in the evidence, however, any reason to suppose that this difference would have swung the balance in the other direction.[9] Plaintiff has not met her burden of showing the court plainly wrong.

Alternatively, plaintiff suggests that Crosby might have become a more

limited type of broker, on the New York Stock Exchange, known as an introducing broker. This itself would not have required substantial operational changes, in fact, plaintiff's suggestion is really that Crosby could become, under this label, a conduit for give-ups though not in any way engaged in normal brokerage activities. But the court found that NYSE required that all brokers, to be members, must be engaged primarily in brokerage, and that in the application of this principle the exchange regarded the broker and its affiliates as one. It found that Management and Crosby, accordingly, would not have been able to qualify for membership. (F. 56). Plaintiff has not successfully attacked this finding.

### NASD Recapture

We turn, accordingly, to plaintiff's second major claim, that without the necessity of a broker affiliate, or changing Crosby's methods of operations, give-ups could have been channeled to Crosby—already eligible to receive them —to be applied against Management's advisory fee, a process that has been described as indirect recapture.

Six of the seven regional exchanges permitted members of the National Association of Securities Dealers (NASD) who were not exchange members, either by joining the exchange as special members, or even without the formality of any membership, to receive customer-directed give-ups.[10] Crosby was a member of NASD. Plaintiff asserts that Crosby, without making any changes in its structure or any basic commitments, was or could have become qualified to receive give-ups on these exchanges, and that Fund could have directed such receipts, having agreed with Management to set

---

9. Two unaffiliated directors testified that they did know of this factor; none testified that they would have decided differently had they considered the matter in those terms. See, further, the account of the December 14, 1966 Fund directors' meeting, post.

10. Securities and Exchange Comm'n, Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. 171 (1966), discussed post.

them off against its advisory fee.[11] Management responds that if Fund had so directed, Crosby's crediting Fund would have violated the anti-rebate rules of the exchanges, and hence would not have been permitted. To this plaintiff replies that by 1965 the Pacific Exchange was allowing funds to recapture brokerage commissions from their broker-affiliates via setoffs against advisory fees owed to management, and that there was no reason to expect that it would draw a distinction, under its anti-rebate rule, against similar recapture of commissions funnelled from independent brokers to NASD members connected with Fund; that Management failed to investigate, or even to inform the unaffiliated directors of the possibility of this indirect recapture; that in 1967 the Philadelphia-Baltimore-Washington Exchange (PBW) did permit a fund to recapture its give-ups through NASD membership of its adviser-underwriters; and that in 1968, when Management finally pursued this subject, a second exchange, Pacific, agreed to essentially this procedure. The balance of this opinion deals with this subject.

### Management's Duty of Disclosure

■ Plaintiff's argument criticizing the Management defendants for not effecting NASD recapture is based on her finding implicit in the Investment Company Act the familiar general principles governing fiduciaries in the area of self-dealing. We do not denigrate these principles, though we need hold relevant only their expression through the federally imposed standard under section 36, which may vary from the state common law. We believe, however, that the Act imposes a more fundamental and pervasive requirement where, because of the struc-

ture of investment trusts, self-dealing is not the exception but, so far as management is concerned, the order of the day. One of the primary reasons for Congress' enactment of the Investment Company Act was its finding that,

> "the national public interest and the interest of investors are adversely affected * * * (2) when investment companies are organized, operated, managed * * * in the interest of directors, officers, investment advisers * * * underwriters * * * rather than in the interest of all classes of such companies' security holders. * * * " 15 U.S.C. § 80a–1(b).

Unlike an ordinary trust, or a business, management's normal activities are frequently touched with self-interest, as the example of give-ups, universally used, and benefitting management at least as much as fund shareholders, clearly shows. Management defendants admit that they gained from the give-up practice, while asserting that Fund also benefitted from the resulting growth.[12] To the extent that they, or the court in finding for them without finding full disclosure, imply that their self-interest could not influence the decisions to be made on behalf of Fund, Congress had an answer. It responded to this problem by enacting a mandatory provision for unaffiliated, that is, independent, watchdog directors. 15 U.S.C. § 80a–10(a).

■ Whatever may be the duty of disclosure owed to ordinary corporate directors, we think the conclusion unavoidable that Management defendants were under a duty of full disclosure of information to these unaffiliated directors in every area where there was even a possible conflict of interest between their interests and the interests of the fund. This duty

---

11. Indeed since Crosby would have done nothing to earn them, under section 17(e) of the Act, 15 U.S.C. § 80a–17(e), Management could not lawfully have kept such money. Furthermore, under familiar fiduciary principles, Management would have been obliged to credit Crosby's receipts, as for example, against Fund's contractual obligation to pay its advisory

fee. Barney v. Saunders, 1853, 57 U.S. (16 How.) 535, 543, 14 L.Ed. 1047; Matter of Provident Management Corp., SEC 12/1/70, CCH Fed. SEC L.Rep. ¶ 77,937. It may be noted that these authorities require accounting even if the fiduciary's receipt was illegal.

12. See n. 8, ante.

could not be put more clearly than was stated by the SEC in 1965.

> "The Investment Company Act's requirement as to unaffiliated directors, if its purposes are not to be subverted, carries with it the obligation on the part of the affiliated directors, and the investment adviser itself, to insure that unaffiliated directors are furnished with sufficient information so as to enable them to participate effectively in the management of the investment company." Imperial Financial Services, Inc., CCH Fed.Sec.L.Rep. ¶ 77,287 at 82,464 (SEC 1965).

Except where it may be fairly assumed that every unaffiliated director will have such knowledge, effective communication is called for. And, in testing that assumption, it must be borne in mind that they are not full time employees of the fund and it may be—as with Fund's unaffiliated directors—that neither their activities nor their experience are primarily connected with the special and often technical problems of fund operation. If management does not keep these directors informed they will not be in a position to exercise the independent judgment that Congress clearly intended. The only question can be whether the matter is one that could be thought to be of possible significance.

### Management's Failure To Disclose

The district court found untrue plaintiff's claim that Management "consistently kept from the directors any of the information which might have aroused them from their inaction." This finding is supportable only in the sense that the concealment was not "consistent." In any other sense it is plainly erroneous as to NASD recapture in the light of the knowledge Management concededly possessed which could well have aroused the unaffiliated directors. As will be developed, the inescapable fact is that Management defendants did, for an extended period of time, keep to themselves possibly, we would say probably, stimulating information.

In June 1965, two representatives of the SEC, Silver and Eisenberg, conducted an inquiry of Fund representatives, trading on the Detroit Stock Exchange and Off-Board Trading by Exchange Members. Sullivan, together with Hamilton, another officer of Management, and Belash, a law partner of Loring, attended. In the course of the proceedings Silver suggested that Crosby, though not an exchange member, could receive give-ups through its NASD membership which could then be set off against the advisory fee. Hamilton responded that directing any give-ups to Crosby would conflict with Illinois blue-sky laws, thus affecting Fund's sales there. Silver replied that the Illinois rule was obviously designed to prevent underwriters from benefitting at the expense of the fund, and asked whether Illinois would object if the give-ups were applied to credit Fund. Sullivan in disregard of the charter obligation not to use money or credits that were available to Fund to support sales of its shares, stated that the change would irritate dealers who had been receiving give-ups and have a consequent bad effect upon sales. Silver inquired whether the need to compete with the funds that had joined the Pacific exchange, and were reducing brokerage commissions that way, might change their view of the economics of the situation, which we interpret as a suggestion that Fund's asset loss of recapturable give-ups might have a more adverse effect on sales than would the loss of rewards for dealers. The SEC had already indicated in its 1963 Special Study, n. 5, ante, that the principal beneficiaries of fund-paid portfolio commissions are not the funds, but the advisers and underwriters. What was new was the suggestion of how, in fact, the interests of Fund could be better served. The suggestion by Silver should clearly have imparted to Management the idea that its benefit could now conflict with Fund's interest—and should, in turn, have made these defendants sensitive to the need for passing the suggestion along to the unaffiliated directors. However, as the court

found, this was not done. Nor was anything else done.

In September 1966, three SEC representatives, Rotberg, Eisenberg and Archie conducted further SEC inquiries, this time entitled Commission Rate Structure. The same Management representatives attended. There was a general discussion of NASD recapture of give-ups.[13] Rotberg suggested, inter alia, that Fund should recapture through Crosby. Sullivan and Belash again mentioned the depressing effect upon sales. It was added that such conduct would conflict with Crosby's contract, and it was again stated that it raised problems under Illinois blue-sky laws. Rotberg pointedly asked what Fund had done since the staff's same suggestions had been made at the previous proceeding. The Fund representatives replied, "Nothing," explicitly adhering to the position that Fund needed the friendship of the small brokers more than it needed the money. No one suggested the possible illegality of recapture under the anti-rebate rules upon which all defendants now rely.[14]

Again, although by this time the conflict was clearly laid out, the court found that nothing was reported by the Management defendants to the unaffiliated directors. In their brief the Management defendants say, seemingly to imply that no communication was necessary, that they "investigated the substance of these questions," and concluded that nothing could be done. "Investigation" seems a palpable exaggeration of what

was done. All the record shows is that they discussed it among themselves.

In sum, we can only conclude that the Management defendants saw a question, that they knew it to be in an area where there was a conflict between their personal interests and the direct interests of the Fund treasury, and that they did not inform the unaffiliated directors or submit it to their consideration.

Nor was this all. On December 2, 1966 the House Committee on Interstate and Foreign Commerce released an SEC report entitled Public Policy Implications of Investment Company Growth (PPI); H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966). At page 173, in a subsection entitled, "Reducing advisory fees," it was stated,

"It would not be inconsistent with those rules for dealer-distributed funds to direct give-ups to their advisor-underwriters, all of whom are NASD members, for the purpose of applying these give-ups to reduce the advisory fees payable by the funds."

Loring, Johnson 2d, and Sullivan discussed this among themselves, but did nothing further. While the Management defendants now claim that they communicated this information to the unaffiliated directors, they face insuperable obstacles to establishing that assertion. In the first place, the court made the following general finding.

"Before this action was brought [the unaffiliated directors] did not have knowledge of any other methods of so-called recapture [than through a broker-affiliate]".[15]

---

13. Management defendants seek to suggest that the 1965 SEC proceedings, having Detroit in their title, raised no questions applicable or relevant to any other exchange. We do not think, in the light of the content, that it was reasonable for Management to see no broader implication in the discussion recounted above. In any event, no argument can be made that the 1966 questioning was so restricted.

14. We flag this matter in anticipation of a later reference because Management de-

fendants, in attempting in their brief to minimize the SEC assertions that recapture was possible, state that the staff suggestion "indicate * * * unawareness of the anti-rebate rules." If so, the Management representatives, in whose court the ball was, were equally myopic.

15. This finding is not contradicted by the finding that Management did not fail to keep the unaffiliated directors informed of "available, proven and legal methods of recapture." That finding must be read in the light of the court's earlier conclusion

We cannot believe that the court meant by this finding that it believed that the unaffiliated directors were given the information, but forgot about it. Nor are Management defendants helped by the evidence they cite to support their claim. They list four matters.

a) That McKenzie, on his own, obtained and read a copy of the PPI report. Even if this can be taken to mean that McKenzie noted and understood the meaning of the two relevant pages in this 346 page report, McKenzie was only one of five unaffiliated directors.

b) That, as the district court found, a copy of the report was given by Loring to Babcock. There is no evidence, however, that the matter of NASD recapture was called to his attention. Babcock did not take the stand. No unaffiliated director testified to any communication with him at that time on the subject of recapture, and there was no evidence to indicate that his retainer included consideration of the possibility of, or the duty to, recapture until his opinion was asked in August 1968.

c) That, as the court found, a summary of the report, prepared by the SEC, was given to all of the unaffiliated directors. The summary, however, did not refer to the portion of the report dealing with NASD recapture.[16]

d) That McKenzie testified that following the issuance of the report, he discussed recovery of give-ups at the December 14, 1966 meeting. The minutes of the meeting state, "Excerpts from the [PPI report] was read, including the factors to be considered in determining the reasonableness of management fees." Determining management fees is the subject of Chapter III, "The Management Function and Its Cost," which occupies some 70 pages of the report. "Reducing advisory fees" by credits through NASD recapture is a short subsection in another chapter. It was never mentioned. Examination of McKenzie's testimony, including all references made in Management's brief, clearly reveals that he was talking about fixing the advisory fee and giving some consideration in connection therewith to recapture through West Coast broker affiliation, the method we have already dealt with.[17] The district court, likewise, did not accept it as showing that NASD recapture was discussed or it would not have made the general finding, previously adverted to, that the unaffiliated directors had no ante litem knowledge of this method of recapture.

On the basis of the above, Management's brief makes the bald statement, "[B]oth the [PPI] report itself and, in particular, the relevant passage, captioned 'Reducing advisory fees' * * * were put before the board." How they could say this, passes our understanding.

### Post Litem

With the commencement of this suit in December 1967, a year after the PPI report, the matter of recapture of give-ups

---

that NASD recapture, even if not unlawful (which it said it was), was at least unproven and of doubtful legality.

16. A defendants' exhibit shows that two summaries were given to the directors. One was a release by the SEC. The other, a mimeographed pamphlet, does not disclose its authorship. The former, without suggesting the alternative, stated that use of "brokerage"—meaning give-ups—to reward sales had a potentially bad effect upon best execution, and encouraged brokers to sell shares of the mutual fund which paid them the most, regardless of its quality. The mimeo mentioned give-ups in terms, but limited itself to stating that the SEC believed that the

exchanges should abolish them in favor of volume discounts.

The Management brief states that "[t]he plaintiff's complaint that this summary 'contained not a word about recapture' (Pl. Br. 34) should be directed to the SEC * * *." Whatever merit there may be in this remark, and we see none, it certainly cannot justify Management's reference to the summary as support for its position that it informed the unaffiliated directors of the PPI position on recapture.

17. At one point there was a McKenzie Plan. It was rejected. We find it of no present relevance.

was sharply brought to the unaffiliated directors' attention. The suit was followed shortly by Securities Exchange Act of 1934 Release No. 8239, dated January 26, 1968, proposing a new rule, 10b–10. In its introductory portion the release stated that the purpose of the proposed rule was to "prohibit investment company managers from directing brokers executing transactions for an investment company to divide their compensation in any way with other brokers unless the benefits of such division accrue to the investment company and its shareholders." It stated that the rule "had its antecedents" in the PPI report, citing specifically the sentence at page 173 which we have quoted ante, and added, "The reasoning on which the proposed rule is based is that if, as pointed out above, a mutual fund manager has various means at his disposal to recapture for the benefit of the fund a portion of the commissions paid by the fund, he is under a fiduciary duty to do so."

The presently relevant portion of the rule is the first subsection.

"Rule 10b–10

"(1) It shall be unlawful for any registered investment company or affiliated person of such registered investment company to directly or indirectly, to [sic] order or request any broker or dealer:

"(a) to pay or arrange for the payment, directly or indirectly, of all or any portion of a commission on any securities transaction to any broker, dealer or any other person *unless* pursuant to a written contract the full amount of such remittance is required to be paid over to such registered investment company, or fees owed by or charged to such registered investment company are required to be reduced in an amount equal to the remittance;
* * * "

The directors, shown the release by Sullivan on February 5, 1968, appointed Sullivan and Loring, both of whom, it will be recalled, represented Management, to advise them what they should do. They, in turn, designated Belash and Reilly of Loring's law firm to investigate the practices and possibilities of recapture on various regional exchanges. Reilly's resulting report was submitted to Sullivan and Loring in late March, and the unaffiliated directors were shortly told of it, and advised that detailed letters of inquiry would be addressed to the exchanges. At this time Reilly's report showed that Pro Fund, Inc., had already been recapturing give-ups on the PBW Exchange, with the exchange's permission, since December 1967, and that, based on information from the Pacific Exchange's president, Reilly thought that Crosby could receive give-ups there "to reduce fund expenses." Neither of these facts were communicated to the unaffiliated directors. It was thought that "they might not see the forest for the trees." No reason was given why it was not immediately decided to "bank" (escrow in the hands of the giving-up brokers) give-ups on those apparently favorable exchanges pending a final resolution of the issue—a procedure not detrimental to the existing give-up procedures if Fund ultimately decided not to recapture.

Two months later Loring's office, characterized by the court as "moving slowly," sent out the promised letters to the exchanges. At the May 29 meeting Loring informed the directors that the manager of the security transactions had been directed to use PBW, when consistent with best execution, and that give-ups on that exchange were being banked pending final determination of whether they were recapturable. By August 1 the same arrangements were instituted with regard to the Pacific Exchange, after it had formally replied that NASD recapture was permissible. The Midwest Exchange ultimately wrote that recapture there was not possible. No written replies appear to have been received from the Detroit and Boston Ex-

changes; oral replies from the president of Boston, and a vice-president of Detroit, had been in the negative. On November 27 the directors voted to recapture the banked PBW and Pacific give-ups. On December 5, give-ups were abolished on all exchanges.

These post litem events, if they do not justify plaintiff's charge of misrepresentation to the unaffiliated directors, at least compel the conclusion that the Management defendants' regard for the need of keeping them abreast in the matter of recapture was minimal, and their persistence in continuing to avoid doing so, to prevent injury to Crosby's relationship with its broker-dealers, consciously maximal.[18] We are obliged to reject their brief's protest that they were always open in their disclosure in matters of self-interest just as we do Johnson's testimonial description of the January 1968 SEC release as being "in the nature of a bombshell that hit us." After the 1965 SEC proceedings, the 1966 proceedings, and the 1966 PPI report, the bomb's fuse had been audible to Management for a long time.

### Illegality of Recapture

Turning to defendants' asserted excuses for any failure to disclose, we commence with their single most important point, as it would be a short answer to plaintiff's NASD recapture claim if defendants could support the district court's findings and rulings as to its illegality. The district court held,

"Insofar as it is a question of fact, this court finds that any scheme involving [Fund's] use of its underwriter Crosby as a recipient of a give-up on the understanding that Crosby's parent would give [Fund] a credit against charges for investment advisory services is manifestly a rebate within the meaning of the anti-rebate constitutions and rules of the NYSE and other exchanges." (F. 84)

\* \* \* \* \* \*

"Inasmuch as an anti-rebate rule is the type of stock exchange rule which has the force of law and is binding alike upon members and customers of the exchange [Silver v. New York Stock Exchange, 373 U.S. 341, 360–361, 83 S.Ct. 1246, 10 L.Ed.2d 389; Colonial Realty Corporation v. Bache & Co., 358 F.2d 178, 181–182 (2nd Cir.)] all recapture devices which are contrary to the anti-rebate provisions of exchange constitutions are illegal." 316 F.Supp. at 57. (Brackets court's)

■ It is not clear what the court meant by its statement that the anti-rebate rule "has the force of law." Certainly no criminal sanction attaches to conduct at variance with such a rule, unless the rule happens to parallel a prohibition of the statute or a SEC rule, which this one does not. If the court's phrase, and use of the word "illegal," implies possible criminality we could not agree, and doubt that it was intended to do so.[19] Of course, in a lower key, the

---

18. Plaintiff claims that the unaffiliated directors were told only half-truths. It is certainly so that they were not told all that was in the report, but whether the omissions made the account misleading, as distinguished from incomplete, we need not pursue. It is clear from Management defendants' testimony, as well as from their brief, that the omissions, however motivated, were intentional. We further note that the court's finding that Babcock "talked with Reilly in between his visits to the regional exchanges and received a copy of Reilly's tentative report a few weeks after it was written"

(F. 99) does not answer plaintiff's complaint. There was a single conversation, in which Reilly stated he told Babcock his "general findings." There is no reason to suppose that he told Babcock what he recommended not be told to the unaffiliated directors. As to a "few weeks" after March, the testimony was, "May or June." One could not say that Babcock was kept au courant.

19. Defendants make vague references to civil liability under the anti-trust laws and SEC Rule 10b–5, and suggest that by recapturing Fund might have dis-

violation of exchange rules by Fund might give rise to civil causes of action based on contract. Roberts v. Criss, 2 Cir., 1920, 266 F. 296, holds that the constitution and rules of an exchange are a contract between the members. Colonial Realty Corp. v. Bache & Co., 2 Cir., 1966, 358 F.2d 178, refers to the authority of exchanges to make and enforce their own rules, subject to only broad limitations, as "supervised self-regulation." Whatever the terminology, the nature of the obligations imposed by such rules is to be determined primarily on the basis of the construction which the exchanges that adopted the rules give to them.[20] A court is not free to regard the problem as a statutory interpretation issue of first impression.

■ The district court, analyzing the issue as an original question, dismissed as irrelevant the wide-spread, accepted use of give-ups, despite its conclusion that they are also rebates, by saying that "a customer-directed give-up which was not used to establish a credit for a customer is no precedent for a customer-directed give-up which does establish such a credit." Recapture, it said, has "the evil consequence of giving back to the customer a dollar credit traceable directly or indirectly to the commission he paid." The fact that there may be some logic in this analysis does not mean that it is correct. The very fact that one type of rebate was uniformly tolerated by the exchanges despite their anti-rebate rules in itself shows that logic alone cannot supply the answer. The controlling answer must be found in how the exchanges, who were the rule-makers, themselves translated their rules. We have seen that the Pacific and PBW Exchanges, when confronted with proposals for recapture, chose to permit it. We do not accept the district court's disregard of that fact, based on its pronouncement that these exchanges were simply mistaken in doing so.[21] This is not to say that the federal courts cannot review an exchange's interpretation of its rules and overrule those that are arbitrary or subjective. Bright v. Philadelphia-Baltimore-Washington Stock Exchange, E.D.Pa., 5/11/71, 327 F.Supp. 495. The district court perceived a distinction between recapturing give-ups for the benefit of the customer and its underwriter in terms of selling its shares, and recapturing to pay the fee of the adviser who had generated the transaction from which the give-up arose. Accepting that, we could not think it arbitrary, in view of the common factors shared by these two kinds of rebates, for an exchange to say that the distinction did not compel a difference in result. We reject the district court's ruling that the decision was illegal.

### Management's Defenses

#### a) Self-Dealing

Management says that it is a "fallacious premise that this is a 'self-dealing'

---

criminated against other investors. They offer, and we can find, no support for this. Moreover, the court having found that the use that was already being made of give-ups was a form of rebate benefitting Fund, and it being even clearer that it benefitted Management, if any discrimination vis-a-vis other customers was involved it was already extant. If a rebate is either an unlawful price discrimination, or a deceptive or fraudulent practice, it does not matter whether it benefits the fund or its managers, or whether the benefit to the Fund be direct or indirect.

20. Some exchange constitutions provide that any interpretation of the constitution or rules by the exchange's governing body are final and conclusive. See NYSE Const. art. III, § 11; PBW Stock Exch. Const. art. III, § 21; Midwest Stock Exch. Const. art. III, § 1. We assume that similar authority is implicit in the rule making and enforcement powers of the governing bodies of other exchanges in the absence of provisions to the contrary. See Pacific Stock Exch. Const. art. III, § 1(e)–(f); Detroit Stock Exch. Const. art. III, §§ 2–5.

21. Nor were they unaware of their anti-rebate rule. Management's letters of inquiry to which they responded in the affirmative were careful to point out its existence.

case. It is not." However, after discussing plaintiff's cases on self-dealing, these defendants eventually conclude with the statement that this is not a self-dealing case because they had in fact made disclosure to the unaffiliated directors.[22] This position eliminates the necessity of our demonstrating, beyond what we already have done, that this is a self-dealing case if the Management defendants breached their duty of disclosure. On this assumption we may omit discussion of the legal authorities. At the same time we note that Management defendants' position appears to be an open acceptance of what we hold to be the fact, that this is a clear conflict of interest case that routinely calls for disclosure quite apart from any special burden that may be implicit in the Investment Company Act.

### b) *The Duty To Experiment*

We pass with equal brevity the court's ruling which it stated disposed of any obligation to recapture even if it was not clearly unlawful. The court said,

"A fiduciary is under no duty to engage in legally doubtful experiments virtually unsupported by custom or convention or court decision." 316 F. Supp. at 57.

In so stating the court answered a wise observation it had made during the course of the trial.

"It may be that we are moving into an era in which the duty of a trustee is not to rely upon custom, habit and practice of his neighbor, but when he has a sufficiently large interest to make it economically perhaps desirable for him to go and make sure that he has moved in a way which is to the greatest benefit of his beneficiary."

We are not so sure that the court's answer was correct.[23] But in any event, it was the directors of Fund, not Management, who were the ones to make the decision. That they need not have decided to experiment is irrelevant. The court's ruling does not excuse Management from its failure to disclose and so permit the unaffiliated directors to decide.

### c) *Management's Awareness*

The Management defendants are accordingly in chancery unless non-disclosure on their part was reasonable, or at least not grossly unreasonable. Primarily they point to the district court's finding that it is "hard to fault" them for not informing the unaffiliated directors of SEC proceedings conducted by "subordinate SEC employees." The court added that these employees "obviously did not see the technical difficulties with suggestions they informally threw out." As to the level of their experience, Silver, Eisenberg and Rotberg, who conducted the proceedings, were associate directors and assistant general counsel of the SEC. They were subordinate only in the narrow sense that they did not speak as the Commission. Nor is there any evidence that Management representatives were struck, either in June 1965, or in September 1966, by the staff's ignorance of technical difficulties. (*Cf.* n. 14, *ante.*) Be that as it may, the September 1966 proceedings were shortly followed by the Commission's own, formal, PPI report. Management defendants, whatever their own views on the feasibility of recapture, were then on full notice that the possi-

---

22. Their brief concludes,

"Because of the decision by disinterested directors and the sanction for management action arising from the disclosures, the 1940 Act and the charter, it follows that management is not guilty of 'self-dealing' and need not have proved, as it did prove, that the policies followed by the Fund were preferable to the plaintiff's claimed alternatives."

23. The court was speaking at trial of the duty of a trustee to seek judicial determination of his obligations. Here we are concerned only with a duty to inquire of the governing boards of the various exchanges whether recapture was possible.

bility of recapture was a substantial issue that directly involved their self-interest. Any contention that the Commission's views were off-hand or so inconsequential that Management defendants were entitled to keep their own counsel and not even mention the issue to the unaffiliated directors is, to put it bluntly, little short of extraordinary. We may add that Management's willingness to disregard the Commission itself casts some doubt on the bona fides of a claim that the earlier expressed views of the staff were ignored because of its inferior position.

### Liability

■ Enough has been said to show that Management defendants were not guilty of mere negligence. They knew, seemingly in June 1965, and at least after the publication of PPI, that the possibility of recapture was a serious and unresolved issue in the industry. They also knew that it was an issue that involved a potential conflict between their interests and the interests of Fund's shareholders. Their failure to disclose the information available to them to the unaffiliated directors was the result of neither inadvertence nor misapprehension of the facts. Among the abuses enumerated in section 1(b) of the Act, quoted ante, is the operation of investment companies in the interest of advisers, underwriters, and other affiliated persons rather than that of the shareholders. By intentionally pursuing a course of non-disclosure these defendants made the effective functioning of the mechanism protecting Fund from their overreaching impossible. We do not believe that Congress intended that the SEC and the federal courts should be powerless to deal with this kind of conduct, or should excuse it on facts such as those disclosed in the case at bar. *See* Aldred Inv. Trust v. SEC, 1 Cir., 1945, 151 F.2d 254, 260, cert. denied 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483. Such a construction of the Act would be inconsistent with Congress' direction in

section 1(b) that the provisions of the Act be interpreted in accordance with its purpose to "mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section." To hold otherwise would render the benefits Congress sought to obtain through the provisions for unaffiliated directors merely precatory, rather than positive. We therefore conclude that the Management defendants were guilty of gross misconduct within the meaning of the Act in failing to disclose the possibility of NASD recapture to the unaffiliated directors. The two individual management defendants, and the Management corporations, must be held liable for damages under section 36.

On the other hand, the unaffiliated directors, with the possible exception of McKenzie, who is not a defendant here, have not been shown to have had any knowledge of the possibility of NASD recapture. Nor did they have any personal conflicting interest which should have sharpened their attention. Plaintiff has not shown that they violated any duty to discover and explore the issue on their own; recapture was a new problem, and they were entitled to rely on the Management defendants, who devoted full time to the investment industry, to advise them of its emergence. While the unaffiliated directors are not free of all obligations to consider matters on their own, we see no basis for holding them in this case.

### The Measure of Damages

The problem remaining is that of damages. This, in a sense, falls into three parts; on what exchanges, as of what date, and how much was lost. As to the first, plaintiff has not shown that exchanges other than PBW and Pacific would have allowed recapture. The evidence to the contrary, that some of the others would in fact not have allowed it, is slim, but the initial burden was on the plaintiff. This issue seems to us to fall, strictly, under the question of liability, and not under questions of dam-

ages reserved for later determination. It is, accordingly, foreclosed.[24]

On the other hand, plaintiff has shown that PBW and Pacific, when formally asked, responded favorably. No material changes in the rules of these exchanges have occurred in recent times. Here, accordingly, we take the opposite tack. We do not think it appropriate at this time to reopen the case and determine by hindsight that possibly a different answer might have been received had requests been made of these exchanges sooner. Equally, particularly in the light of the duty that we find faced the unaffiliated directors in this area, we will not reopen to determine whether they would have made a different decision earlier as to recapture from the one they ultimately made. In each respect, Management having wrongfully prevented the matter from coming up, must bear the full consequences.

There is one issue, however, that we believe to be one of fact that the district court, on remand, should resolve from the present record in the light of this opinion. This is the date that Management defendants should have been alerted and started to bank give-ups.[25] We hold, as matter of law, in view of the PPI report, that this date can be no later than March 1, 1967. The district court may conclude, from all the circumstances, that it should have been earlier. When that date has been determined, the Management defendants are to be held liable for all transactions, making allowances for best execution, and all resulting give-ups that could have been recaptured on those two exchanges.

We make no determination as to costs or counsel fees in this court at this time. Costs and counsel fees in the district court to be as it shall determine.

Judgment in accordance herewith.

---

24. This may be tested. Suppose that it had not appeared that any exchanges would have permitted NASD recapture. In such event we cannot think that there could have been any further district court proceedings, regardless of our holding herein on other issues.

25. Strictly, perhaps, indeed probably, as an abstract matter, they should have banked on all NASD exchanges, but since recovery is now restricted to two, the question is to be limited to those two. However, the district court may well find that at a reasonable interval after a final determination to bank give-ups should have been made it would have been learned that exchanges other than PBW and Pacific would have ruled against indirect recovery and that thereafter proper practice would have been, consistent with best execution, to make as many transactions as possible on the two favorable exchanges.