**168**

Abraham WEISS and Laurence Rittenberg, Plaintiffs,

v.

Thomas F. CHALKER et al., Defendants.

Rose LERMAN, Custodian for Ellen Lerman, under New York Uniform Gifts to Minors Act, and Leonard Thorner, Plaintiffs,

v.

Harry G. BURKS, Jr., et al., Defendants.

Nos. 67 Civ. 95, 68 Civ. 1044.

United States District Court,
S. D. New York.

May 25, 1972.

Leonard I. Schreiber, New York City, Gen. Counsel, for plaintiffs.

Ira Jay Sands, New York City, for plaintiffs.

Pollack & Singer, New York City, for defendants Anchor Corporation, et al.

Seward & Kissel, New York City, for defendants Fundamental Investors, Inc. and Anchor Growth Fund, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Zuckerman, Smith & Co.

Carro, Spanbock & Londin, New York City, for defendant Jesup & Lamont.

Valicenti, Leighton, Reid & Pine, New York City, for defendants Burks, Hopkins and Kemmerer.

Miller, Montgomery, Spalding & Sogi, New York City, for defendant First Investors Corp.

Gifford, Woody, Carter & Hays, New York City, for defendant Emanuel Deetjen & Co.

Laventhall & Zicklin, New York City, for Objectors Rittenberg and Ettinger.

Kreindler & Kreindler, New York City, for Objectors Fiestal, Goldberg and Lasker.

Kass, Goodkind, Wechsler & Gerstein, New York City, for Objector Weber.

Pomerantz, Levy, Haudek & Block, New York City, of counsel to Objectors Rittenberg, Ettinger and Weber and Objectors Fiestal, Goldberg and Lasker.

Weinstein & Levinson, New York City, for Objector Band.

Charles Trynin, New York City, for Objector Margot Aronsohn.

GURFEIN, District Judge.

The Court of Appeals for the Second Circuit in Saylor v. Lindsley, 456 F.2d 896, 904 (1972), reversed the approval of a settlement by the District Court over objection where discovery had been inadequate. Chief Judge Friendly wrote: "We have felt compelled to go this far into the merits only to show that the settlement should not have been approv-

ed over [the plaintiff's] opposition[1] when there is such doubt whether there had been truly adversary discovery prior to the stipulation of settlement and he was afforded no opportunity for any *thereafter*" (emphasis supplied).

This seems to be a clear reaffirmation that the District Court does not have to make the choice between approving and disapproving the settlement on the basis of the discovery thus far had. The Court may, and indeed must, when it is not satisfied that the tools for measuring the adequacy of the settlement have been supplied, order further discovery. There can, of course, be no precise measuring rod; but unless the District Court has available to it either hard facts or a rational explanation for inability to discover them, it does not know the range of appropriate settlement and it is flying blind.

I have concluded not to determine the fairness of the settlement at this time but to allow further discovery. So that the parties may understand the Court's problems in determining fairness, I shall state some of them in rather summary fashion.

### THE CLAIMS

This is a consolidation of two actions for the purpose only of considering the proposed settlement; those two actions are Weiss and Rittenberg v. Chalker, et al., and Lerman and Thorner v. Burks, et al. There are in addition five separate actions against substantially the same defendants and with essentially the same major themes. These involve, broadly speaking, the following principal claims for relief:

1. That certain defendants, including officers, affiliated directors and the investment adviser of two mutual funds, Fundamental Investors, Inc. and Anchor Growth Fund, Inc. (hereinafter "the funds"), unlawfully failed to recapture "give-ups" of brokerage commissions and to obtain reciprocals for the benefit of the funds. On this aspect of the case, reliance is placed on the recent decision of the First Circuit Court of Appeals in Moses v. Burgin, 445 F.2d 369, cert. denied, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed. 2d 547 (1971).

2. That certain defendants, including fiduciaries of the funds, breached their duties in arranging the merger of the funds' investment adviser and underwriter, namely, Anchor Corporation ("Anchor"), with Washington National Corporation, and are thus liable to the funds for the profits made on this "sale" of the advisory office under the rule laid down in Rosenfeld v. Black, 445 F.2d 1337 (2 Cir. 1971); see 336 F.Supp. 84 (S.D.N.Y.1972) (on remand).

3. That certain defendants permitted excessive fees to be charged by the investment adviser and that the excess should be recouped by the funds.

### THE SETTLEMENT

The settlement proposed is that no money would be paid now in settlement of alleged past wrongs, but that the investment adviser, Anchor, would enter into prospective agreements for investment supervisory and corporate administrative services under which Anchor would credit against the management fees of the funds certain "net profits" derived from brokerage transactions. It would be provided that Anchor, itself or through an affiliate, would apply for membership on the Philadelphia-Baltimore-Washington Stock Exchange or the Pacific Coast Stock Exchange, or both. Anchor would direct brokerage

---

[1]. The stipulation of settlement in *Saylor* was entered into by the plaintiff's attorney without his client's authorization. At the hearing on the settlement, the plaintiff appeared through new counsel in opposition to the settlement.

It may be noted that in the present case the plaintiff Rittenberg has appeared in opposition to the settlement.

business to itself or the affiliate in its discretion and a portion of the "net profits" from this brokerage would be credited to reduce the management fees due to Anchor from the funds. Anchor guarantees that such offset applicable against management fees owed by the two funds shall not be less than $2,500,-000 during the first ten years following execution of the new agreements. If such a practice of crediting "net profits" should be prohibited or even if Anchor ceases to serve the funds further as investment adviser, Anchor would pay the balance still due on the figure of $2,-500,000 at the end of ten years. It has been stated that the present value of $2,500,000 payable without interest in ten years is the sum of $1,250,000; but, of course, if earned commissions were credited in the interim the value of the settlement would be more than the commuted value. Anchor would also pay $375,000 toward counsel fees for the plaintiffs.

### LIABILITY UNDER MOSES v. BURGIN

Until Moses v. Burgin, *supra,* there was no authority that "give-ups" or reciprocals should be recovered for the benefit of mutual funds. A little history is necessary to understand the present state of the law and the factual questions that must be answered before the limits of a fair settlement can be staked out adequately.

Anchor, like many underwriter-advisers of mutual funds which do not have an affiliated sales force or brokerage service but instead rely on independent brokers, engaged in a practice of requiring brokers who earned commissions for executing its funds' portfolio orders to "give up" part of those commissions to brokers who engaged in selling the funds' shares and to brokers who furnished statistical research to the underwriter-adviser. This practice, which primarily benefited the underwriter-adviser rather than the funds, was widespread until December 5, 1968 when, by order of the SEC, all stock exchanges abolished give-ups to other brokers that were dictated by the customer.

Certain funds had found methods, before the abolition of the customer-directed give-up, to funnel back to the funds what was equivalent to a portion of the give-ups. A few mutual funds had an affiliate which was a member of a regional stock exchange and, hence, was entitled under those stock exchange practices to receive give-ups from executing brokers; these give-ups, instead of being funnelled directly to the fund, would be credited against the management fee owing by the fund so as to reduce it. Another method was for the adviser or an affiliate to be a member of the NASD and thereby obtain a similar give-up legitimately under the practices of certain regional stock exchanges. These methods were not used by defendant Anchor and thereby hangs a claim for relief.

The proponents of the settlement and the objectors differ almost passionately on the true liability of the defendants for failure to recapture, on how damages are to be measured, and on the duration of the period for measuring damages.

The proponents urge that since liability under Moses v. Burgin, *supra,* stems from failure to disclose the possibility of recapture to the unaffiliated directors, there could have been no liability until the affiliated directors *knew* of the practicality of recapture of commissions; and that this knowledge was not brought home to them, or at least that they could not be charged with a consistent policy of not disclosing it, until *after* the well-known SEC report on investment companies of December 1966, or at the earliest, therefore, until the Spring of 1967.[2] The First Circuit in Moses v. Burgin, *supra,* held that, on the facts

---

2. Public Policy Implications of Investment Company Growth, H.R.Rep.No. 2337, 89th Cong., 2d Sess. (1968).

found by the District Court, the defendants were on notice of the possibility of recapture *at least* from the time of the publication of the SEC's report in December 1966 and that they should have informed the unaffiliated directors within four months thereafter, or by March 1, 1967. The District Court was left free on remand to "conclude, from all the circumstances, that it should have been [done] earlier," 445 F.2d at 385.

One of the objectors' lawyers, Mr. Pomerantz, asserts that a principal director-defendant actually knew of the possibility of using the practice of the Pacific Coast Stock Exchange as a vehicle for recapture as early as 1963, and that he should have presented the possibility of such a course of action to the unaffiliated directors as early as that, under the rule of law held to exist in Moses v. Burgin, *supra.*

We must remember that in Moses v. Burgin, *supra,* the Court was laying down for the first time the key factors in determining liability. Since, in this case, it is possible that the keys may be found, the search should be made. There will be trouble enough in deciding the ultimate bearing of knowledge upon the quantum of recovery, but the extent of knowledge is an indispensable factor in assessing this settlement. An essential fact is missing.

For instance, the First Circuit laid stress on "management's awareness." It concentrated on such matters as discussions with the SEC staff in 1965 and 1966. As in the present case, these were not matters of law but of fact. They were largely items of direct rather than circumstantial evidence. They dealt with oral conversations, transcribed interviews, the allegedly intentional foot-dragging of particular lawyers, what SEC reports were read. All this is the very pertinent material on which judgments of knowledge and intent are formed.

When we see that total brokerage commissions paid by the two funds (which,

it should be noted, may in no way ultimately affect the quantum of recovery) amounted to about 57 million dollars for the years 1963 to 1970, it does seem important to pin down when the directors did find out about the alleged practicality of recapture. The deposition evidence is scant and unsatisfactory; the documentary material is surface stuff. In the words of Chief Judge Friendly: "there had been no attempt to find the kind of inculpatory correspondence that so often reposes in corporate files" (Saylor v. Lindsley, *supra,* at 901). Even controversy as to what course of action to take may be proof of knowledge. That is not to prophesy that inculpatory material exists, but at least such proof should be sought.

It is also disturbing to the Court that other fundamental matters, largely questions of fact, are the subject of assertion and counter-assertion without proof. For example, the proponents urge that recapture became impractical after customer-directed give-ups were abolished in December 1968. The objectors say that recoupment by the use of NASD discounts is still available and that 20–40% of certain commissions could thereby be recaptured at present. As another example, the proponents say that only a maximum of about 20% of brokerage commissions were, in fact, recaptured for its funds by a particular adviser who allegedly used every conceivable means of recapture from 1966 through 1970. A recent commentator has figured that the net percentage of commissions practically recapturable by means of an affiliated broker is only about 12%. Wyckoff, Recapture of Fund Brokerage, 4 Rev.Sec.Reg. 847, 851 (1971). The objectors, however, claim that the funds should have recaptured 60% of the brokerage fees incurred from 1963 to 1970. Finally, of course, the very settlement here proposed embraces a form of recapture of commissions by the funds although there is no assurance that this will be permitted in the future.

See, *e.g.*, Lipton, Institutional Membership Proposals: SEC and NYSE Seen in Basic Accord, N.Y.L.J., May 2, 1972, at 1, col. 3.

This is not to say that the whole case must be tried to conclusion, or there would be no point to settlements. It does mean that guide-posts should be more firmly fixed.

## LIABILITY UNDER ROSENFELD v. BLACK

In view of this determination there is no need to consider, at this time, the various arguments advanced with respect to the Rosenfeld v. Black claim arising from the merger. There may be some lurking factual issues that merit exploration with respect to that claim too. For example, the proponents suggest that there was in this case no influencing of the funds' shareholders to approve the reinstated advisory contracts, because the proxy machinery was in the hands of the unaffiliated directors who gained nothing for themselves and who are beyond reproach. The objectors contend that the defendants did influence that vote.[3] The proponents contend that if the alleged illegal consideration received is not limited to the difference between the price and the market value of the adviser's stock, then it should be measured by the difference between the price received and the going concern value. The going concern value would presumably include the intangible value of an existing, trained and competent staff. Perhaps discovery might shed some light on whether there is such value, in the circumstances, and how it is expressed in dollars. On the record to date, the Court would simply have to guess the size of this value put in issue by the proponents themselves.

As to the legal questions arising from diverse interpretations of the reach of Rosenfeld v. Black, *supra,* these can await the discovery, or an amended settlement proposal. Among the questions that have been raised are:

1. Does *Rosenfeld* apply only to a situation where the investment adviser *retires* from the scene, as did Lazard Frères, or does the rule forbid the sale of control of a corporate adviser, even though the investment advisory staff still remains intact?

2. If there was an improper sale of office by the device of merger, are the individual defendants, who arranged for the sale of control, liable for the excess price received by the non-defendant stockholders of the adviser corporation as well as for the excess amount they themselves received?

3. What should be deemed the improper excess in price and by what formula shall it be calculated?

4. Should a court insist on some payment, in any event, by those who sold control illegally, especially in the light of the small per share recovery that is now proposed or is, indeed, attainable for the benefit of the funds?

## CONCLUSION

Mr. Schreiber will not be superseded as general counsel for the plaintiffs, but I shall appoint Pomerantz, Levy, Haudek & Block as special co-general counsel for the limited purpose of conducting discovery proceedings on behalf of the plaintiffs for ninety days. If more time should be thought necessary, further application may be made to the Court. The Pomerantz firm has been proposed for co-general counsel by six objectors. That firm was successful in both Moses v. Burgin, *supra* and Rosenfeld v. Black, *supra,* and is thoroughly familiar with this area of the law. After completing discovery, the new co-general counsel will brief the Court on the new facts

---

3. Another, similar factual dispute meriting further discovery is present on the question whether the unaffiliated directors were sufficiently free of domination by the affiliated directors to give an effective, independent approval of the allegedly excessive advisory fees paid to Anchor.

elicited and their alleged bearing on the propriety of the settlement. I am certain that the Judge then presiding will give all counsel an opportunity to comment and reply.

Settle order on notice.

